David Mara, Esq. (230498)
dmara@maralawfirm.com
Jamie Serb, Esq. (289601)
jserb@maralawfirm.com
**MARA LAW FIRM, PC**
2650 Camino Del Rio North, Suite 205
San Diego, California 92108
Telephone: (619) 234-2833
Facsimile: (619) 234-4048

Matthew R. Bainer Bar No. 220972
THE BAINER LAW FIRM
1901 Harrison Street, Suite 1100
Oakland, CA 94612
Telephone: (510) 922-1802
Facsimile:  (510) 844-7701
mbainer@bainerlawfirm.com

Attorneys for Plaintiffs HECTOR IBANEZ

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN KRAMER on behalf of himself, all others similarly situated, and on behalf of the general public,<br><br>        Plaintiffs,<br><br>    v.<br><br>XPO LOGISTICS, INC.; and DOES 1 – 100,<br><br>        Defendants.<br>_____<br>HECTOR IBANEZ on behalf of himself, all others similarly situated, and on behalf of the general public<br><br>        Plaintiffs,<br><br>    v.<br><br>XPO LAST MILE, INC.; and DOES 1 – 100,<br><br>        Defendants. | Case No. 3:16-cv-07039-WHO<br>*Consolidated with* 3:17-cv-04009-JSC<br><br>[*Assigned to the Honorable William H. Orrick*]<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>**Date: September 4, 2019**<br>**Time: 2:00 p.m.**<br>**Ctrm.: 2**<br><br>Action Filed:  September 22, 2016<br>Date Removed:  December 8, 2016<br>Trial Date:  December 3, 2018<br><br>This Document Relates To:<br>*Kramer*, 3:16-cv-07039-WHO<br>*Ibanez*, 3:17-cv-04009-JSC |

**TO: ALL PARTIES HEREIN AND TO THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff, Hector Ibanez, moves this Court for an order: (1) Provisionally certifying the Class for settlement purposes only; (2) Preliminarily approving the class action settlement embodied in the Stipulation and Settlement of Class Action Claims; (3) Approving the Class Notice and the plan for distribution of the Notice; (4) Appointing the Settlement Administrator; and (5) Scheduling a Final Approval Hearing.

This motion is set for determination on September 4, 2019, at 2:00 p.m. in Courtroom No. 2 in the above entitled courthouse located at 450 Golden Gate Avenue, San Francisco, California 94102. This motion is based upon this notice, the accompanying Memorandum of Points & Authorities filed herewith, the accompanying Declaration of David Mara filed herewith, the Joint Stipulation and Settlement Agreement and all exhibits thereto, the filings on record in this case, and upon such further evidence, both documentary and oral, that may be presented at the hearing of this motion.

Dated: August 16, 2019                    **MARA LAW FIRM, PC**

By:/s/ *Jamie Serb*
      DAVID MARA
      JAMIE SERB
      Attorneys for Plaintiff

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  FACTUAL AND PROCEDURAL BACKGROUND.................................................. 2

   a.   Investigation................................................................................................... 3

   b.   Settlement Negotiations ................................................................................. 3

III. SUMMARY OF SETTLEMENT ........................................................................... 4

   a.   The Proposed Class........................................................................................ 4

   b.   Settlement Terms ........................................................................................... 4

     i.    Class Representative's Service Award/General Release Payment ............... 4

     ii.   Attorneys' Fees and Costs ........................................................................... 6

     iii.  Payment to the LWDA ................................................................................ 7

     iv.   Settlement Administration Expenses ........................................................... 7

     v.    Settlement Payments to Class Members ...................................................... 8

     vi.   Funding and Distribution of Settlement Funds ........................................... 9

     vii.  Uncashed Checks and Cy Pres Payment .................................................... 9

     viii. Cy Pres Beneficiary ................................................................................... 10

     ix.   Released Claims ......................................................................................... 10

IV.  CONDITIONAL CERTIFICATION SHOULD BE GRANTED ............................. 11

   a.   Rule 23(a) Class Requirements are Met ........................................................11

     i.    Numerosity..................................................................................................11

     ii.   Commonality...............................................................................................11

     iii.  Typicality ................................................................................................... 12

     iv.   The Class Representative and His Counsel are Adequate ........................... 12

   b.   Rule 23(b) Standards are Satisfied ............................................................... 13

     i.    Common Issues Predominate...................................................................... 13

     ii.   The Class Action Device is Superior .......................................................... 14

     iii.  No Manageability Issues Preclude Certification......................................... 14

   c.   Plaintiff's Counsel Should be Appointed as Class Counsel ........................... 14

V.   THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED ......................... 15

| | | | |
|---|---|---|---|
| | a. | Court Approval Under Rule 23(e) Should Be Granted | 15 |
| | b. | The Settlement Resulted From Arm's-Length Negotiations | 16 |
| | c. | The Balancing of Factors | 16 |
| | | 1. Employer Status | 16 |
| | | 2. Challenges to Certification | 17 |
| | | 3. Liability on the Merits | 18 |
| | d. | Range of Exposure and Reasonable Discount | 20 |
| VI. | | NATURE AND METHOD OF NOTICE | 21 |
| | a. | Data to Administrator and Notice Mailing | 21 |
| | b. | Taxpayer Identification Numbers, and Reminder Efforts | 21 |
| | c. | The Notice Method Meets the Requirements of Rule 23 | 23 |
| VII. | | CONCLUSION | 23 |

# TABLE OF AUTHORITIES

**CASES**

*Advertising Specialty Nat'l Asso. v. Federal Trade Com.*,
238 F.2d 108 (1st Cir. 1956) ...................................................................................................11

*Alvarado v. Dart Container Corp. of California*
(2018) 4 Cal.5th 542, 565 .........................................................................................................19

*Amaral v. Cintas Corp. No. 2*
(2008) 163 Cal.App.4th 1157, 1201 ..........................................................................................19

*Amchem Prods, Inc. v. Windsor*,
521 U.S. 591 (1997).....................................................................................................................13

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) .....................................................................................................12

*Brinker Restaurant Corp. v. Superior Court*,
53 Cal.4th 1004 (2012) .......................................................................................................14, 15

*Ching v. Siemens Industry, Inc.*,
2013 U.S. Dist. LEXIS 169279 (N.D. Cal. 2013) .....................................................................12

*Cook v. Niedert*,
142 F.3d 1004, 1015 (7th Cir. 1998).............................................................................................6

*Dilts v. Penske Logistics, LLC*,
267 F.R.D. 625 (S.D. Cal. 2010).................................................................................................12

*Doninger v. Pac. Nw. Bell, Inc.*,
564 F.2d 1304 (9th Cir. 1977.....................................................................................................11

*Dynamex Operations West, Inc. v. Superior Court*
(2018) 4 Cal.5th 903 ..................................................................................................................17

*Early v. Superior Court*,
79 Cal.App.4th 1420 (2000) .........................................................................................................5

*Gatreaux v. Pierce*,
690 F.2d 616 (7th Cir. 1982) .....................................................................................................15

*Grant v. Capital Mgmt. Servs., L.P.*,

    2013 WL 6499698 (S.D. Cal. 2013) ................................................................. 14

*Hanlon v. Chrysler Corp.*,

    150 F. 3d 1011 (9th Cir. 1998) ....................................................... 12, 14, 15, 16

*In re Heritage Bond Litigation*,

    2005 WL 1594403 (C.D. Cal. June 10, 2005) ..................................................... 15

*In re Surebeam Corp. Secs. Litig.*,

    2004 WL 5159061 (S.D. Cal. 2004) ............................................................ 12, 13

*Joel A. v. Giuliani*,

    218 F.3d 132 (2d Cir. 2000) ............................................................................... 15

*Koehl v. Verio, Inc.*

    142 Cal.App.4th 1313 (2006) ............................................................................... 5

*Lazarin v. Pro Unlimited, Inc.*,

    2013 WL 3541217 (N.D. Cal. 2013) ................................................................... 14

*Leyva v. Medline Indus.*,

    716 F.3d 510 (9th Cir. 2013) .............................................................................. 14

*Nat'l Rural Telecommunication Cooperative v. Directv, Inc.*, .

    221 F.R.D. 523 (C.D. Cal. 2004) ....................................................................... 16

Roberts v. Texaco,

    979 F.Supp. 185 (S.D.N.Y. 1997) ........................................................................ 6

*Rodriguez v. Hayes*,

    591 F.3d 1105 (9th Cir. 2010) ............................................................................ 12

*Rodriguez v. West Publishing Corp.*,

    563 F.3d 948 (9th Cir. 2009) .............................................................................. 16

*S. G. Borello & Sons, Inc. v. Department of Industrial Relations*

    (1989) 48 Cal.3d 341, ........................................................................................ 17

*Staton v. Boeing*,

    327 F.3d 938 (9th Cir. 2003) ................................................................................ 6

*Telecomm. Corp. v. DirectTV*,

221 F.R.D. 523, 527 (C.D. Cal. 2004) ................................................................................................21

*Thornton v. East Texas Motor Freight,*

497 F.2d 416, 420 (6th Cir. 1974) ..................................................................................................6

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. Conoco Phillips Co.*,

593 F.3d 802 (9th Cir. 2010) ........................................................................................................11

*Vanwagoner v. Siemens Industry, Inc.*,

2014 U.S. Dist. LEXIS 67141 (N.D. Cal. 2014) ..........................................................................12

*Whiteway v. Fedex Kinkos Office & Print Services, Inc.*,

2007 U.S. Dist. LEXIS 95398 (N.D. Cal. 2007) ............................................................................6

## STATUTES

*California Labor Code § 1194* ..........................................................................................................10

*California Labor Code § 1197* ..........................................................................................................10

*California Labor Code § 1197.1* .......................................................................................................10

*California Labor Code § 1198* ..........................................................................................................10

*California Labor Code § 1542* ......................................................................................................5, 11

*California Labor Code § 201* ............................................................................................................10

*California Labor Code § 201.5* .........................................................................................................10

*California Labor Code § 202* ............................................................................................................10

*California Labor Code § 203* ............................................................................................................10

*California Labor Code § 203(a)* ........................................................................................................19

*California Labor Code § 205.5* .........................................................................................................10

*California Labor Code § 218* ............................................................................................................10

*California Labor Code § 218.5* ...........................................................................................................5

*California Labor Code § 222* ............................................................................................................10

*California Labor Code § 223* ............................................................................................................10

*California Labor Code § 224* ............................................................................................................10

*California Labor Code § 226* ............................................................................................................10

*California Labor Code § 226.2* .........................................................................................................10

*California Labor Code* § 226.7 ................................................................................................ 10

*California Labor Code* § 2698 ................................................................................................ 10

*California Labor Code* § 2802 ................................................................................................ 10

*California Labor Code* § 510 .................................................................................................. 10

*California Labor Code* § 512 .................................................................................................. 10

*California Labor Code* § 515 .................................................................................................. 10

*California Labor Code* § 515 (e) ............................................................................................ 19

Bus. & Prof. Code §17200 ...................................................................................................... 10

Cal. Code Regs. Tit. 8 § 13520 ............................................................................................... 19

Fed. R. Civ. P. 23 (a) ........................................................................................................ 11, 12

Fed. R. Civ. P. 23 (a)(1) .......................................................................................................... 11

Fed. R. Civ. P. 23 (a)(4) .......................................................................................................... 12

Fed. R. Civ. P. 23 (b) .............................................................................................................. 11

Fed. R. Civ. P. 23 (b)(3) ................................................................................................ 11, 13, 14

Fed. R. Civ. P. 23 (c)(2) .......................................................................................................... 23

Fed. R. Civ. P. 23 (c)(3) .......................................................................................................... 23

Fed. R. Civ. P. 23 (e) .............................................................................................................. 15

Fed. R. Civ. P. 23 (g) .............................................................................................................. 14

**OTHER AUTHORITIES**

*Manual for Complex Litigation*, Fourth, § 22.661 (2004) ..................................................... 17

# I. INTRODUCTION

Named Plaintiff HECTOR IBANEZ ("Plaintiff" or "Mr. Ibanez"), a former driver for a contract carrier that contracted services to Defendant XPO Last Mile, Inc. ("XPO LM" or "Defendant") (collectively referred to as the "Parties"), alleges XPO LM was his lawful employer and that XPO LM failed to provide legally compliant meal and rest breaks, failed to pay wages for all hours worked, waiting time penalties, reimbursement of business expenses, and legally compliant pay stubs.

Mr. Ibanez now seeks preliminary approval of the Parties' Joint Stipulation and Settlement Agreement ("Agreement" or "Settlement"). The proposed Settlement is a non-reversionary $5,500,000.00 Gross Settlement Amount on behalf of approximately 3,772 class members (1,981 drivers and 1,791 helpers). The proposed Settlement Class is defined as "all individuals who did not contract with XPO LM and (1) are "Drivers" that performed delivery services within the state of California during the Class Period for a Carrier, or (2) are "Helpers" with a California address and were/are associated with any Carrier that performed delivery services within the state of California during the Class Period."[1] The Class Period extends from September 22, 2012 to the date of preliminary approval of the Settlement. Participating Class Members will automatically receive their share of the Settlement without needing to submit a claim; however, some Participating Class Members will be required to submit their taxpayer identification numbers to the Settlement Administrator prior to disbursement.

Assuming each class member participates in the Settlement, the Settlement is projected to pay each class member an average of $935.18, less employee taxes for the wages portion of the settlement share. The proposed Settlement was reached after considerable investigation – including the depositions of multiple managers from locations throughout California, three 30(b)(6) witnesses, and several contract carriers, as well as the analysis of thousands of documents, contracts, emails and the interpretation of thousands of lines of data code. The Settlement is reflective of the strengths and vulnerabilities of Mr. Ibanez's case, the risks of class certification and whether XPO LM would be determined to be the employer of the putative class, as well as the risks of proceeding on the merits of the claims. When taking these risks into account, the proposed Settlement is in the best interests of the Class. It is therefore

---

[1] The Class expressly excludes those drivers and helpers who delivered goods that were tendered to them at the Macy's warehouse located at 1200 Whipple Road, Union City, CA 94587. These individuals are part of the putative class in *Ramon Garcia, et al. v. Macy's West Stores, et al.*, case number 4:16-cv-04440.

respectfully requested that the Court grant preliminary approval of the Settlement, approve the Class Notice, appoint CPT Group, Inc. as the Settlement Administrator, appoint Mr. Ibanez as the class representative, appoint Plaintiff's counsel as Class Counsel, and schedule a final approval hearing.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

XPO LM is a third-party logistics company that operates as a freight forwarder for its clients, such as retailers and distributors of furniture, appliances, and large electronics. XPO LM enters into delivery service agreements with contract carriers, which provide last mile delivery services. The contract carriers XPO LM contracts with for last mile services employ additional drivers and helpers – the putative class members involved in this matter - to fulfill these contracts. This lawsuit alleges that XPO LM is the lawful employer of these drivers and helpers and that XPO LM violated various California wage and hour laws. Mara Decl. ⁋ 28.

This matter was initially filed by Kevin Kramer in the Alameda County Superior Court on September 22, 2016. XPO LM Answered the Complaint on December 7, 2016 and removed the action to the Northern District of California on December 8, 2016. On December 9, 2016, XPO LM filed a Notice of Related Cases, alerting the Parties to the *Carter*[2] and *Garcia*[3] matters. On January 10, 2017, the Parties in all three matters attended a Case Management Conference, wherein the Court ordered all counsel to define the putative classes in all three matters. This led to all parties stipulating to their respective classes and the Court entering the order thereon on February 15, 2017. On January 27, 2017, the Court also ordered the parties in all three matters to coordinate discovery efforts. Mara Decl. ⁋ 29.

On May 23, 2017, Mr. Ibanez filed a class action complaint in San Bernardino County Superior Court. XPO LM removed the case on June 23, 2017 and subsequently transferred it to the Northern District Court on July 17, 2017. On July 28, 2017, the Parties stipulated to consolidating *Kramer* and *Ibanez*, which was approved by the Court on August 3, 2017. Mr. Kramer withdrew as Plaintiff and Class Representative in October 2017. On February 6, 2018, the Parties stipulated to extend the *Ibanez* Class Period to encompass the *Kramer* class period, which the Court approved on February 7, 2018. Mara Decl. ⁋ 30.

[2] *Ron Carter, et al. v. XPO Last Mile, Inc., et al,* case number 3:16-cv-01231-WHO.
[3] *Ramon Garcia, et al. v. Macy's West Stores, et al.,* case number 4:16-cv-04440-WHO.

### a. Investigation

Plaintiffs in this matter and in *Garcia* jointly propounded special interrogatories, requests for admissions, and demands for production of documents to which XPO LM responded. Mr. Ibanez propounded another set of demands for production, to which XPO LM also responded. XPO LM produced hundreds of thousands of documents – the majority of which were produced in a raw electronic format, requiring Plaintiff to hire an e-discovery expert to incorporate the documents into Relativity for ease of access, review, and analysis. XPO LM also provided Plaintiff with electronic records related to the Settlement Class Members, requiring Plaintiff to consult with an IT professional to interpret thousands of lines of code and run SQL searches and queries in the database provided. Mara Decl. ¶ 31.

Plaintiff deposed three XPO LM Rule 30(b)(6) witnesses – two of whom required travel to Atlanta, Georgia. Additionally, Plaintiff attended and deposed multiple managers responsible for various markets throughout California, as well as several contract carriers (i.e. individuals who contracted directly with XPO LM and hired the drivers and helpers who are putative class members in this matter). Mara Decl. ¶ 32.

Throughout the litigation, the Parties met and conferred regarding multiple discovery disputes. Some of these disputes were resolved informally, others required filing discovery dispute briefs with the Court. (*See* Dkt Nos. 39-46; 60, 62-63). In addition, Plaintiff interviewed over one hundred putative class members regarding their experiences with XPO LM. Plaintiff also obtained an expert for data analysis in support of the upcoming class certification briefing, of which Plaintiff would have filed if the Parties had been unable to reach the Settlement the Parties now ask the Court to preliminarily approve. Mara Decl. ¶ 33.

### b. Settlement Negotiations

The Parties attended two days of mediation in this matter, held on October 25, 2018 in San Francisco and on November 13, 2018 in Toronto, Canada. In each of these sessions, the Parties engaged in extensive, arm's-length negotiations mediated by respected wage and hour mediator, Michael Dickstein. After considerable negotiation, the Parties were unable to reach a settlement at mediation. However, the Parties continued to negotiate at arm's-length, with Mr. Dickstein's assistance in the following months. On February 11, 2019, the Parties reached an agreement in principle to settle the case.

the terms of which were negotiated over the following months and finalized in the Joint Stipulation and Settlement Agreement ("Agreement") the Parties now ask the Court to preliminarily approve. Mara Decl. ¶ 34; **Exhibit 1**.

### III.   SUMMARY OF SETTLEMENT

The principle terms of the Agreement are as follows:[4]

#### a.   The Proposed Class

The Agreement proposes a Settlement Class comprised of:

All individuals who did not contract with XPO LM, and (1) are "Drivers" that performed delivery services within the state of California during the Class Period for a Carrier, or (2) are "Helpers" with a California address and were/are associated with any Carrier that performed delivery services within the state of California during the Class Period. This Settlement Class expressly excludes those drivers and helpers who delivered goods that were tendered to them at the Macy's warehouse located at 1200 Whipple Road, Union City, CA 94587.

There are approximately 3,772 individuals who fall within this Settlement Class definition. The Parties previously stipulated to a similar class definition on February 3, 2017. See Dkt.#23-24. However, the definition reflected in the Agreement contains more precise language than the previous stipulation and was crafted after Plaintiff had conducted significant discovery. Prior to the hearing on this Motion for Preliminary Approval, Plaintiff will file a stipulation with amended complaint that incorporates this change to the class definition, as well as adds a claim for penalties under the Private Attorney General Act of 2004 ("PAGA").

#### b.   Settlement Terms

Under the Agreement, XPO LM shall pay $5,500,000.00 ("Gross Settlement Amount" or "GSA") to fully and finally settle this matter. This is the total amount XPO LM can be required to pay under this Agreement, with the exception of Employer payroll taxes, which will remain XPO LM's exclusive responsibility and will be paid by XPO LM separate and apart from the GSA. ***No portion of the GSA will revert to XPO LM for any reason***. The following deductions from the GSA will be made, subject to the Court's approval:

##### i.   Class Representative's Service Award/General Release Payment

Subject to Court approval, Mr. Ibanez shall receive a payment not to exceed $10,000.00 in

---

[4] The terms of the Settlement are set forth in the Agreement attached as **Exhibit 1** to the Declaration of David Mara, Esq., in Support of Plaintiff's Motion for Preliminary Approval.

consideration for a general release of all his claims against XPO LM. The payment shall be made from the GSA. If the amount awarded is less than the amount requested, the difference shall become part of the Net Settlement Amount ("NSA"). The payment is in consideration for a general release of Plaintiff's claims against XPO LM. The Agreement includes the following Plaintiff's release:

> **Plaintiff's Release of Claims and General Release.** As of the Effective Final Settlement Date, and in exchange for the Class Representative General Release Payment to the named Plaintiff in an amount not to exceed Ten Thousand Dollars and No Cents ($10,000.00), Plaintiff shall give the following general release of claims for himself and his respective spouse, heirs, successors and assigns, forever release the Released Parties from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties and expenses of any nature whatsoever, from the beginning of time through the date of his signature on this Agreement, known or unknown, suspected or unsuspected, whether in tort, contract, equity, or otherwise, for violation of any federal, state or local statute, rule, ordinance or regulation, including but not limited to all claims arising out of, based upon, or relating to the services provided to Defendants, termination of such services, or the remuneration received in connection with those services. Plaintiff's Release of Claims also includes a waiver of California Civil Code section 1542, which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

> This release excludes any release of any claims not permitted to be released by law.

*See* **Exhibit 1** attached to the Mara Declaration at Section III, paragraph K.

Moreover, as representative for the absent class members, Plaintiff risked a potential judgment taken against him for attorneys' fees and costs if this matter had not been successfully concluded. Case law holds that a losing party is liable for the prevailing party's costs. *See Early v. Superior Court*, 79 Cal.App.4th 1420, 1433 (2000). And in some wage and hour actions, such as this case, pursuant to *California Labor Code* § 218.5, the prevailing party can be liable for attorneys' fees as well. Though the fee agreement provides that Class Counsel would pay such costs, Plaintiff would nevertheless have had a cost bill entered against him leaving him ultimately liable for potentially hundreds of thousands of dollars in the unexpected possibility that Class Counsel did not meet their obligation to cover those costs. Mara Decl. ¶ 35. Unfortunately, there have been judgments like this entered against class representatives.[5] The

---

[5] *See*, e.g. *Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313, 1328 (2006) (a wage and hour class action where Defendant prevailed

risk of payment of XPO LM's costs, alone, is a sufficient basis for an award of the requested service award. Few individuals are willing to take this risk, and Mr. Ibanez championed a cause on behalf of others with potentially huge monetary risks.

Courts have regularly and routinely granted approval of settlements containing such enhancements. *See*, e.g., *Staton v. Boeing*, 327 F.3d 938, 977 (9th Cir. 2003). The typical enhancement award in wage and hour cases ranges from $5,000 to $75,000, although some awards may be higher. Very commonly there is more than one class representative who receive awards in the above range.[6]

Additionally, the modern-day work force is mobile, with employees holding several jobs over the span of their career. It is also true that prospective employers in this computer, high-tech age "Google" and/or do extensive background checks and have access to court databases to see if applicants have ever filed a lawsuit or have ever been sued. Here, Plaintiff's conduct will not be lost on a prospective employer who has to choose between an applicant who has never sued an employer and one who has done so. The requested award far from compensates Plaintiff for opportunities he may lose in the future because of the exercise of a Constitutional right to Petition the Courts for redress of a grievance.

### ii. Attorneys' Fees and Costs

Subject to Court approval, Plaintiff's Counsel shall request an award of attorneys' fees in an amount of $1,375,000.00 (25% of the GSA).[7] This includes work remaining in documenting the settlement, securing Court approval, ensuring the settlement is fairly administered, and obtaining dismissal of the action. Also, subject to Court approval, Plaintiff's Counsel shall request a reimbursement from the GSA for actual litigation costs in an amount not to exceed $100,000.00.[8] *See* Mara Decl., **Exhibit 1**.

at trial, the named Plaintiffs were held liable, jointly and severally for the Defendant's attorneys' fees); *Whiteway v. Fedex Kinkos Office & Print Services, Inc.*, No. 05-2320, 2007 U.S. Dist. LEXIS 95398 (N.D. Cal. Dec. 17, 2007) (a wage and hour misclassification case lost on summary judgment, after the case was certified, the named Plaintiff was assessed costs in the sum of $56,788.).

[6] *See*, e.g., *Cook v. Niedert*, 142 F.3d 1004, 1015 (7th Cir. 1998); *Roberts v. Texaco*, 979 F. Supp. 185 (S.D.N.Y. 1997) ("present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril, a substantial enhancement award is justified"); *Thornton v. East Texas Motor Freight*, 497 F.2d 416, 420 (6th Cir. 1974) ("We also think there is something to be said for rewarding those drivers who protect and help to bring rights to a group of employees who have been the victims of discrimination.").

[7] Although the Agreement permits Class Counsel to request a fee up to 33 1/3% of the GSA, Class Counsel intend to only request 25% of the GSA, which is the federal benchmark for fee requests. Mara Decl. ¶ 36.

[8] Plaintiff will only seek the amount of actual costs incurred during the litigation of this case. Should the actual costs exceed $100,000.00, Plaintiff will only seek reimbursement of costs up to $100,000.00. If the actual costs are less than the $100,000.00 cap, the remainder will become part of the NSA, distributable to Participating Settlement Class Members. At present, Counsel

Section III, paragraph G(2).

Class Counsel will move the Court for a fee award in conjunction with final approval. Class Counsel will file the moving papers in support of their attorney fee request 7 days before the expiration of the Notice Period. Although the settlement agreement provides an amount not to exceed 33 1/3% of the GSA for attorneys' fees, Class Counsel intends to request only 25% of the GSA as their fee award, which is in line with the federal benchmark for such awards. Class Counsel will submit a fee motion, supporting their request for 25% of the GSA – which is $1,375,000.00 – including a lodestar crosscheck, hours, and hourly rates.[9]

### iii.  Payment to the LWDA

Subject to Court approval, the Agreement allots $550,000.00 of the GSA to PAGA penalties ("PAGA Payment"). Seventy-five percent (75%) ($412,500.00) of the PAGA Payment shall be paid to the LWDA, and twenty-five percent (25%) ($137,500.00) of the PAGA Payment will become part of the Net Settlement Amount distributed to Participating Class Members. Mara Decl., **Exhibit 1** at Section I, paragraph BB.

### iv.  Settlement Administration Expenses

After reviewing competing bids from ILYM Group, Inc., Simpluris, Inc., and CPT Group, Inc., the Parties have agreed to the appointment of CPT Group, Inc. ("CPT") as the settlement administrator. CPT provided the cheapest bid for this matter and is an experienced class administration company that has acted as claims administrator in numerous wage and hour cases. The Agreement allots an amount not to exceed $75,000.00[10] to administer this Settlement, which falls within the range of estimates Class Counsel has received in the past for settlements of similar size and circumstances. CPT has provided an estimate that its expenses will not exceed $42,000.00, which was less than the Simplus bid ($63,635.00) and the ILYM bid ($50,189.79). Mara Decl. ¶ 38; *See* **Exhibit 2** (administrator bids).

These costs are reasonable, as CPT will mail notice packets to the class, maintain a website which

---

have incurred approximately $95,474.09 in costs to litigate this matter. Mara Decl. ¶ 37.
[9] At present, Counsel have worked 1,831.76 hours, incurring a $1,257,670.00 lodestar with hourly rates between $400 and $850. Mara Decl. ¶¶ 9-19, 36, **Exhibit 3**; Bainer Decl. ¶ 6.
[10] This amount is greater than CPT's bid, to provide room for any unexpected costs. If the final cost of administration is less than the $75,000.00 cap, the remainder will become part of the NSA, distributable to Participating Settlement Class Members.

Plaintiff's Notice of Motion and Motion for          -7-
Preliminary Approval of Class Action Settlement                    Case No. 3:16-cv-07039-WHO
                                                                   *Consolidated with 3-17-04009-JSC*

has information about the Settlement and links to the settlement documents, and keep track of requests for exclusion from the Settlement. CPT will also call or email those class members who have not submitted their taxpayer identification numbers and send out reminder postcards to remind them to submit their taxpayer identification numbers. Should preliminary and final approval be granted by the Court, CPT will work with XPO LM to facilitate the funding of the GSA, disbursement of the court approved payments, and disbursement of the NSA to Participating Settlement Class Members. Mara Decl. ¶ 39.

The Settlement Administration Costs will be paid out of the GSA. If CPT's actual expenses or the amount awarded is less than the amount allotted in the Agreement, the difference shall become part of the NSA and be available for distribution to Participating Settlement Class Members. Mara Decl. ¶ 40.

### v. Settlement Payments to Class Members

After all deductions have been made, it is estimated that $3,527,500.00 ("Net Settlement Amount" or "NSA") will be available for disbursement to Participating Settlement Class Members, resulting in an average payment of $935.18[11] per class member. Per the Agreement, "Participating Settlement Class Members" is defined as those Settlement Class Members who have not timely and validly requested exclusion from the Settlement. The money available for payout to these individuals comes out of the NSA, which is what remains of the GSA after subtracting all Court approved attorneys' fees and costs, the class representative service award/general release payment, settlement administration costs, and the LWDA's portion of the PAGA Payment.

Each Individual Settlement Share will be calculated as follows:

**Individual Settlement Share Calculation.** Each Participating Settlement Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the number of weeks he or she was active in California based on the Class Records[12] provided by Defendants, divided by (ii) the total number of active weeks including all Participating Settlement Class Members based on the same Class Records, and then multiplied by the Net Settlement Amount. Therefore, the value of each Settlement Class Member's

---

[11] $3,527,500 / 3,772 = $935.18.

[12] The Parties recognize that the best available information from which to estimate Settlement Class Members' workweeks is based on the date the Settlement Class Member first appeared in Defendants' records ("Qualification Date"). The Qualification Date will be treated as the Settlement Class Members' start dates. The end date, will be the later of (1) the date when the Settlement Class Member was removed from Defendants' system (i.e., deactivated), or (2) the date of Preliminary Approval ("End Date"). The calendar weeks between the Qualification Date and the End Date, will be considered the number of active workweeks for purposes of calculating the Settlement Class Members' Individual Settlement Shares. *See* Mara Decl., **Exhibit 1**, Section III, paragraph F(1)(b).

Individual Settlement Share ties directly to the amount of weeks that he or she was active during the Class Period.

*See* Mara Decl., **Exhibit 1**, Section III, paragraph F(1). This method of calculation provides the closest analogy to a "workweek" calculation that could be achieved by using the records available to XPO LM. By using these calculations, Participating Settlement Class Members will automatically be allocated an Individual Settlement Share tied to the amount of time each of them were active in the records available to XPO LM.

33.3% of each Individual Settlement share is intended to settle claims for unpaid wages and will be reported on an IRS Form W2s, subject to all tax withholdings customarily withheld from an employee's wages. The remainder will be allocated as interest (33.3%) and penalties (33.4%) and is intended to settle the non-wage claims for interest and penalties and will be reported on IRS Form 1099s. See Mara Decl., **Exhibit 1** at Section III, paragraph F(2).

### vi. Funding and Distribution of Settlement Funds

Subject to the Court's final approval, and provided that there are no objections or appeals to the Court's Final Approval Order and Judgment, the Gross Settlement Fund shall be funded by XPO LM with 14 days after the Effective Final Settlement Date.[13] Within 21 business days after the Effective Final Settlement Date, the Administrator will disburse all payments required under the Settlement Agreement. *See* Mara Decl., **Exhibit 1** at Section III, paragraph I(10)(a)-(c).

### vii. Uncashed Checks and Cy Pres Payment

Pursuant to the Agreement, any checks issued to Settlement Class Members shall remain valid and negotiable for 180 days from the date of issuance. The Parties agreed that any uncashed check funds will be sent to the California State Controller's Office – Unclaimed Property Fund. Settlement Class Members who did not cash their checks on time will still be able to claim their settlement money from the Unclaimed Property Fund at a future date. *See* Mara Decl., **Exhibit 1** at Section III, paragraph I(14).

Within 200 calendar days of mailing checks to Participating Settlement Class Members, the Settlement Administrator will deposit with the Cy Pres Beneficiary any funds that were allocated to Participating Settlement Class Members who did not submit a taxpayer identification number to the

---

[13] The effective date of this Settlement will be when (1) if no appeal has been filed, the deadline for appealing the Court's order finally approving the Settlement; or (2) if an appeal has been filed, the final resolution of any appeal in favor of finally approving the Settlement. See Mara Decl., **Exhibit 1**, at Section I, paragraph O.

Settlement Administrator. *See* Mara Decl., **Exhibit 1** at Section III, paragraph I(14).

### viii. Cy Pres Beneficiary

The *cy pres* beneficiary will receive the funds that were allocated to Participating Settlement Class Members who, despite the Administrator's efforts to contact, did not submit their taxpayer identification numbers to the Administrator.

The Parties chose the United Way of California as the *cy pres* beneficiary:

The United Way of California. The United Way of California is an umbrella organization, supporting multiple local United Ways throughout the state that all serve the public by working towards financial stability of the citizens they support. Many of these local United Ways have specific programs aimed at promoting steady, gainful employment of Californians, something that meets the objectives of a lawsuit brought with the aim of enforcing employee rights, and supports silent class members through the variety of programs offered. For example, the United Way Bay Area, the local program covering the location in which Named Plaintiff worked, has programs such as "SparkPoint", which operates counseling centers throughout the Bay Area that offer job coaching and training, career development, and business development, providing Northern Californians with the skills needed to find and maintain a lifelong career. The United Way Bay Area also offers programs like "Mayors Youth Jobs+", which helps young adults find employment through internships, apprenticeships, trainings and other opportunities to allow future members of the workforce to obtain employment and post-secondary opportunities. Beyond just programs like these that support job seekers and employees in the Bay Area, the United Way also advocates at the policy level for an increase to the State minimum wage, something implicated explicitly in this lawsuit, and is in the interest of the plaintiff class.

*See* Mara Decl., **Exhibit 1,** Section I, paragraph O.

### ix. Released Claims

In exchange for XPO LM's promise to make the payments provided for in the Agreement, as of the Effective Final Settlement Date, Participating Settlement Class Members will:

release all known and unknown claims ***arising from or related to facts and claims alleged in the Operative Complaint***, and any claims that could have been raised therein ***based on the facts alleged in the Operative Complaint***, whether known or not, including: (1) failure to pay all straight time wages (Labor Code §§ 510, 515, 1194); (2) failure to pay overtime (Labor Code §§ 218, 218.5, 222, 223, 224, 510, 1197, 1198); (3) failure to pay minimum wages (Labor Code §§ 1194, 1197, 1197.1); (4) failure to authorize and permit rest periods (Labor Code §§ 226.7); (5) failure to provide meal periods (Labor Code §§ 226.7, 512); (6) knowing and intentional failure to comply with itemized wage statement provisions (Labor Code §§ 226, 226.2); (7) failure to pay all wages due at the time of termination of employment (Labor Code §§ 201, 201.5, 202, 203, 205.5); (8) violation of the Unfair Competition Law (Bus. & Prof. Code §17200); (9) failure to reimburse business expenses (Labor Code § 2802); (10) penalties pursuant to the Private Attorneys' General Act of 2004 (Labor Code § 2698, et seq.); and (11) Industrial Welfare Commission Wage Orders. The release is for the benefit of the Released Parties and applies only to periods of time within

the Class Period when the Participating Settlement Class Members meet the criteria for participating in this Settlement.

The release covers claims that were alleged or could have been alleged in Plaintiff's complaint and the release is tied to the facts and allegations contained therein. *See* Mara Decl., **Exhibit 1**, at Section I, paragraph II; Section III, paragraph J. Only Plaintiff Ibanez has agreed to a general release of all claims, including a waiver under California Civil Code section 1542. *See* Mara Decl., **Exhibit 1**, at Section III, paragraph K.

## IV. CONDITIONAL CERTIFICATION SHOULD BE GRANTED

A class action may be certified if all four prerequisites under Rule 23(a) are satisfied and at least one subsection under Rule 23(b) is met. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304 (9th Cir. 1977). The requirements of Rule 23(a) are referred to as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. Conoco Phillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010). As will be discussed below, these requirements are met here. In addition, the Parties agreed to certification of the Class under Rule 23(b)(3) which has the added requirement of "predominance." *Id.* XPO LM does not oppose certification for the purpose of settlement only. As such, the Parties seek provisional certification of the Class. Should the Settlement not be approved or not become final for any reason, the Parties agree no class will be certified, and XPO LM's agreement to certify a class conditionally for settlement purposes only will not be used in connection with any subsequent motion for class certification.

### a. Rule 23(a) Class Requirements are Met

#### i. Numerosity

Rule 23(a)(1) is typically referred to as "numerosity" in that it requires a class that is "so numerous that joinder of all members is impracticable." The term "impracticable" does not mean "impossible," and only refers to "the difficulty or inconvenience of joining all members of the class." *Advertising Specialty Nat'l Asso. v. Federal Trade Com.*, 238 F.2d 108, 119 (1st Cir. 1956). Here, there are approximately 3,772 class members and it would not be practical to join so many parties to the lawsuit. Therefore, the numerosity requirement is satisfied.

#### ii. Commonality

Rule 23(a) requires that "there are questions of law or fact common to the class." However, "all

questions of fact and law need not be common to satisfy the rule…[and] [t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class. *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1019 (9th Cir. 1998). The Ninth Circuit has held that commonality exists "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001). Here, common questions exist, such as whether XPO LM's uniform policies deprived the Class of wages and legally compliant meal and rest periods. Courts in the Ninth Circuit have found this sufficient to show commonality.[14]

### iii. Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." This requirement is "permissive" and requires only that the representative's claims are reasonably related to those of the absent class members. *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). Plaintiff's claims and those of the putative class members are based on the same alleged course of conduct, i.e., the claim that XPO LM does not pay all wages owed or provide compliant meal and rest periods. Plaintiff and the Class are also alleged to have suffered similar injury, i.e., the non-payment of premiums for allegedly unprovided or non-duty-free meal and rest periods, and unpaid wages to class members who were paid on a flat rate basis for 8 hours of work and worked over 8 hours.

### iv. The Class Representative and His Counsel are Adequate

The proposed Class Representative and his counsel have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement has two prongs, the first being "that the representative party's attorney be qualified, experienced, and generally able to conduct the litigation." *In re Surebeam Corp. Secs. Litig.*, 2004 WL 5159061, *5 (S.D. Cal. 2004). In this case, Plaintiff's Counsel, David Mara and Jamie Serb of Mara Law Firm, PC and Matthew Bainer of Bainer Law Firm, meet this standard and have been appointed class counsel in numerous class actions.

---

[14] *See Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 633 (S.D. Cal. 2010); *Ching v. Siemens Industry, Inc.*, 2013 U.S. Dist. LEXIS 169279, *4 (N.D. Cal. 2013); *Vanwagoner v. Siemens Industry, Inc.*, 2014 U.S. Dist. LEXIS 67141, *11 (N.D. Cal. 2014).

*See* Mara Decl. ¶¶ 8, 11, 14; Bainer Decl. ¶¶ 4-5.

The second prong of the adequacy test is "that the suit not be collusive and plaintiff's interests not be antagonistic to those of the remainder of the class." *In re Surebeam Corp. Secs. Litig.*, 2004 WL 5159061, *1-2 (S.D. Cal. 2004). Here, there is no evidence of antagonism between the Class Representative's interests and those of the Class. The Class Representative has litigated this case in good faith and the interests of the Class Representative are aligned with those of the Class as they all share a common interest in challenging the legality of the alleged policies and procedures on which the claims are based. There is also no evidence of any collusion between the Parties. Plaintiff's counsel negotiated with XPO LM to pay $5,500,000.00 to settle and counsel was only able to negotiate this sum after extensive exchange and analysis of information and data, numerous depositions, as well as two days of mediation with a professional neutral. These reasons compel that Mr. Ibanez should be appointed as Class Representative. XPO LM does not oppose the appointment of Mr. Ibanez as Class Representative for settlement purposes only. At the Final Approval Hearing, Class Counsel will request final approval of a Class Representative General Release Payment to compensate Mr. Ibanez for agreeing to a general release of his claims, for his efforts in prosecuting this matter, and for the risks and stigma he now faces for doing so.

### b. Rule 23(b) Standards are Satisfied

#### i. Common Issues Predominate

In addition to the Rule 23(a) requirements, a court must find that common issues of law or fact "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). With regard to the requirements of subsection (b), Rule 23(b)(3) allows class certification where common questions of law and fact predominate over individual questions and class treatment is superior to individual litigation. The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). To determine whether common questions predominate, a court is to consider "the relationship between the common and individual issues." The proposed Class in this case is sufficiently cohesive to warrant adjudication by representation. Furthermore, because the "predominance" factor concerns liability, any variation in damages is insufficient to defeat class certification. *Leyva v. Medline Indus.*, 716 F.3d 510,

514 (9th Cir. 2013). Plaintiff contends all claims in this litigation are based on allegedly common, class-wide policies and procedures, and that liability could be determined on a class-wide basis. *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1033 (2012). As noted above, the major issues of whether XPO LM provided timely and duty-free meal and rest periods, and paid all wages owed to Plaintiff and the Class stem from what Plaintiff claims are uniform policies and practices.

### ii.  The Class Action Device is Superior

The class action device is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Certification of the Class will allow class members' claims to be fairly, adequately, and efficiently resolved to a degree that no other mechanism would provide. Alternative methods of resolution would be individual claims for relatively small amount of damages. *Hanlon*, 150 F. 3d at 1019-20. These claims "would prove uneconomic for potential plaintiffs" because 'litigation costs would dwarf potential recovery.'" *Id.* at 1023.

### iii.  No Manageability Issues Preclude Certification

Finally, no issues of manageability preclude certification. A court faced with a request for a settlement-only class need not inquire whether the case would present intractable problems of trial management, even though other requirements under Rule 23 must still be satisfied. *See, e.g., Lazarin v. Pro Unlimited, Inc.*, 2013 WL 3541217, *5 (N.D. Cal. 2013). Nevertheless, as discussed herein, the proposed plan of distribution and settlement process are efficient and manageable.

### c.  Plaintiff's Counsel Should be Appointed as Class Counsel

Rule 23(g) requires that courts consider the following four factors when appointing settlement class counsel: (1) whether counsel has investigated the class claims; (2) whether counsel is experienced in handling class actions and complex litigation; (3) whether counsel is knowledgeable regarding the applicable law; and (4) whether counsel will commit adequate resources to representing the class. *See Grant v. Capital Mgmt. Servs., L.P.*, 2013 WL 6499698, *2-3 (S.D. Cal. 2013). It is clear from the record presented herein that Plaintiff's Counsel should be appointed Class Counsel. Plaintiff's Counsel is highly experienced and knowledgeable regarding complex wage and hour class actions like this one. Mara Decl. ¶¶ 1-8, 11, 14; Bainer Decl. ¶¶ 4-5. Indeed, Plaintiff's counsel was class counsel in *Hohnbaum et al. v. Brinker Restaurant Corp et al.*, which is the subject case in the landmark decision of *Brinker Restaurant*

*Corp. v. Superior Court*, 53 Cal.4th 1004 (2012). Mara Decl. at ¶ 4. Plaintiff's counsel have prosecuted numerous cases on behalf of employees for California Labor Code violations and thus are experienced and qualified to evaluate the class claims and to evaluate settlement versus trial on a fully informed basis, and to evaluate the viability of the defenses. Mara Decl. ¶ 1-8, 11, 14; Bainer Decl. ¶¶ 4-5. In sum, Plaintiff's counsel are fully committed to representing the class in this case, have the skill and expertise to do it properly, and will continue to do so whether or not the settlement is approved. Accordingly, appointment of David Mara and Jamie Serb of Mara Law Firm, PC and Matthew Bainer of Bainer Law Firm, as Class Counsel is appropriate.

## V. THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED

### a. Court Approval Under Rule 23(e) Should Be Granted

Rule 23(e) provides that any compromise of a class action must receive court approval. The court has broad discretion to grant approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion." *Hanlon*, 150 F.3d at 1026. In deciding whether a settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlement, particularly where complex class action litigation is concerned." *In re Heritage Bond Litigation*, 2005 WL 1594403 (C.D. Cal. 2005). Court approval involves a two-step process in which a court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted. *Manual of Complex Litigation*, Fourth Ed., § 21,632 (2004). At the preliminary approval stage, the Court need only "determine whether the proposed settlement is within the range of possible approval." *Gatreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). A class action settlement should be approved if "it is fundamentally fair, adequate and reasonable." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

Although at preliminary approval, the Court need not engage in the rigorous analysis required for final approval (*see Manual for Complex Litigation*, Fourth, § 22.661 at 438 (2004)), the ultimate fairness determination will include balancing several factors, including:

> the strength of plaintiffs' case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the

reaction of the Class Members to the proposed settlement. *Officers for Justice*, *supra*, 688 F.2d 615, 625.

Not all of the above factors apply to every class action settlement, and one factor alone may prove determinative in finding sufficient grounds for court approval. *Nat'l Rural Telecommunication Cooperative v. Directv, Inc.*, 221 F.R.D. 523, 525-26 (C.D. Cal. 2004). District courts have wide discretion in assessing the weight and applicability of each factor. *Id.*

### b. The Settlement Resulted From Arm's-Length Negotiations

The Ninth Circuit has shown longstanding support of settlements reached through arms' length negotiation by capable opponents. In *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009), the Ninth circuit expressly opined that courts should defer to the "private consensual decision of the [settling] Parties." *Id.* at 965, citing *Hanlon*, 150 F.3d at 1027. The proposed Settlement is the product of arm's-length negotiations that spanned over two days of mediation facilitated by Mr. Dickstein, one of the most respected mediators in wage and hour class actions.

### c. The Balancing of Factors

The factors noted above are commonly considered at preliminary approval. The factors here, in their respective levels of applicability, favor approval of the Settlement. Mr. Ibanez submits and XPO LM disputes that this case was factually and legally strong. This matter was settled after substantial discovery, which included written discovery that resulted in thousands of pages of documents, thousands of lines of code, and numerous depositions. Thus, at the point the Settlement was initially agreed to, no one was in a better position than Plaintiff's counsel to understand the strengths and potential limitations of Mr. Ibanez's case and thus evaluate the reasonableness of the amount offered in settlement. Mara Decl. ¶ 41.

Mr. Ibanez contends that XPO LM's failure to provide compliant meal and rest periods and pay all wages owed are the predominant claims in the lawsuit. However, before reaching the merits of these claims, Mr. Ibanez would first have to prove that XPO LM is his and the Class Members' lawful employer and successfully certify the class. Mara Decl. ¶ 42.

### 1. Employer Status

All of the claims alleged in this matter are based on XPO LM's failure to classify Plaintiff and the putative class members as employees. Based on deposition testimony and documents produced in this

matter, Plaintiff contends that XPO LM substantially controls the putative class members and would meet the factors delineated in the *Borello* test in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, as well as the "ABC test" outlined in the recent California Supreme Court decision in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903. XPO LM contends that Plaintiff and putative class members are not its employees, but the employees of its contract carrier partners, who control the putative class members' hiring, firing, schedules, and pay. While Plaintiff believes in the strength of his arguments, he also recognizes the risk that the Court may determine Plaintiff and the putative class were not employees of XPO LM. If the Court ruled in favor of XPO LM on this issue, all of Plaintiff's claims would be extinguished, as they are all dependent upon the Court agreeing that XPO LM is Plaintiff and class members' lawful employer. Mara Decl. ¶ 43.

### 2. Challenges to Certification

While Plaintiff remains confident in the strength of his claims, he recognizes the risks of continuing with further litigation. Namely, XPO LM relies on the fact that, for the unpaid wages claim, the proposed class member drivers and helpers are paid differently, depending on the arrangement with the various contract carriers. Based on this, XPO LM argues that Plaintiffs could not show on a class-wide basis that the drivers and helpers were paid less than minimum wage, because the foundational element, i.e., how and what the drivers and helpers were paid, varied. XPO LM also argues that the issue of whether drivers and helpers were provided meal and rest periods was not susceptible of common proof. In this regard, XPO LM argues that, even if it were deemed the employer, it would be a co-employer with the contract carriers, who were involved in hiring, firing, and paying the class member drivers and helpers. Thus, XPO LM argues that the determination of whether drivers and helpers were provided meal and rest periods would depend exclusively on XPO LM's policies or lack thereof, but also on whether the various contract carriers provided meal and rest periods. Although Plaintiff is confident the common questions that would be framed for certification would avoid these problems, these variances could cast doubt on whether class treatment is appropriate and therefore had to be factored for purposes of exploring class-wide settlement. Mara Decl. ¶ 44.

### 3. Liability on the Merits

Plaintiff could only reach the arguments on the merits of his claims if he successfully proved XPO LM was his lawful employer and certified the class. Plaintiff recognizes that none of his class-wide claims would result in a guaranteed win.

The core claims here are for meal periods, rest periods, and unpaid wages. Each of these claims required the threshold showing that XPO LM was the employer of the drivers and helpers. If the Court found this foundational showing lacking, all of Plaintiff's claims would fail. In addition to this hurdle, Plaintiff's claims for meal and rest periods faced significant challenges that had to be considered in exploring class-wide settlement.

Plaintiff's meal and rest period claims are based on the fact that XPO LM does not have policies or practices of providing meal and rest periods to the class member drivers and helpers. From this failure to provide meal and rest periods, Plaintiff argued XPO LM owes Labor Code § 226.7 premiums for each shift worked. Aside from its employment status argument, XPO LM raises significant challenges to these claims that had to be considered. It argues that, regardless of whether it had policies and practices for the provision of meal and rest periods, liability would turn on whether the contract carriers, who were involved in initiating the hiring process and furnishing wages to the drivers and helpers, had meal and rest period policies. Thus, XPO LM argued that the question of liability turned on whether, despite the absence of meal and rest period policies directly applicable to class members, drivers and helpers received meal and rest periods pursuant to policies and practices communicated through their respective contract carriers. Mara Decl. ¶ 45.

If the Court found this to be the gauge of whether the drivers and helpers received lawful meal and rest periods, it would have a significant impact on both certification and liability, as Plaintiffs would also have to show that drivers and helpers were not provided meal and rest periods from their respective contract carriers. Although, Plaintiff argues that the question of meal and rest period liability is not necessitated by a showing of contract carrier policies and practices, due to Plaintiff's claims of XPO LM's extensive and pervasive control over the drivers' and helpers' workday, XPO LM's arguments had to be strongly considered in exploring class-wide settlement. Mara Decl. ¶ 46.

XPO LM also argued Plaintiff's claims were preempted under 49 U.S.C. § 31141, Federal Motor Carrier Safety Administration (FMCSA) regulations, an issue that is currently pending before the Ninth Circuit. If Defendant were successful on this issue, all of Plaintiff's claims for meal and rest breaks would fail entirely. Given the uncertainty of how the Ninth Circuit will rule, a significant discount had to be factored into evaluating class-wide settlement of the meal and rest break claims. Mara Decl. ¶ 47.

Plaintiff's unpaid wages claim stems from the fact that the drivers and helpers at issue here are not paid by the hour, but on a flat, or daily rate of pay. Plaintiff claims that, like a salary for non-exempt workers, the flat rate pay system does not pay for overtime hours, i.e., hours exceeding eight daily hours or forty weekly hours. See Labor Code section 515 (e); see also *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 565 ("[T]he flat sum compensates the worker for only nonovertime hours worked"). Thus, Plaintiff claims that, for hours worked in excess of eight daily or forty weekly, drivers and helpers are owed minimum wage. Mara Decl. ¶ 48.

In addition to its employment status argument, Defendant counters these claims by arguing overtime hours and compensation does not apply to drivers and helpers. Thus, Defendant argues, a fixed, flat rate of pay, which is commonplace in the trucking industry, pays for all hours worked at the minimum wage so long as the fixed rates exceed minimum wage for all hours worked. Defendant also argues that the foundational element of what the drivers and helpers were paid in terms of a flat rate is dependent on the individualized inquiry into the various contract carrier arrangements with drivers and helpers, which negatively impacts class certification and/or maintaining class certification. Mara Decl. ¶ 49.

Defendant also had considerable arguments relating to the additional claims for waiting time penalties, itemized wage statements, and PAGA. XPO LM argued that, even if it was determined to be Plaintiff's employer, it would not be liable for waiting time penalties because a "good faith dispute" exists over the payment of past wages. *See* Cal. Code Regs. Tit. 8 § 13520; *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1201. Further, XPO LM contends Plaintiff would have to prove it "willfully" failed to pay class members appropriate wages due upon separation of employment, which XPO LM contends was not willful, as it was not adjudged to be the employee's employer at the time of separation. *See* Cal. Lab. Code § 203(a). Likewise, XPO LM argued, since it has to be adjudged as the employer before it

could be held liable on the merits for any of Plaintiff's claims, it would not be held liable for inaccurate wage statements, as it could not have knowingly or intentionally failed to provide wage statements to individuals it did not consider employees of XPO LM. XPO LM further argued any PAGA penalties awarded would almost certainly be reduced significantly, given XPO LM had to be adjudged as the class members' employer, and made a good faith attempt to comply with the law.[15] Mara Decl. ¶ 50.

Moreover, Plaintiff's PAGA claims are based on the same alleged unlawful conduct as his class claims. Therefore, PAGA penalties could only be awarded if the factfinder agreed with Plaintiff's theories of liability. Should the Court agree with any of XPO LM's defenses to its employer status, certification, or on the merits, the potential exposure for PAGA would be reduced and any associated PAGA penalties would be extinguished, as penalties can only be awarded if the Court agrees with Plaintiff's underlying allegations. The likelihood of the Court reducing any PAGA penalties awarded to Plaintiff and aggrieved employees – assuming XPO LM is determined to be the employer and liability is established – is higher in this case than others, as XPO LM was not a direct employer of the aggrieved employees. Further, these penalties would be duplicative of the recovery from the underlying violations. Therefore, Plaintiff recognizes and reasonably believes the Court would significantly reduce any PAGA penalties if XPO LM was determined to be the employer and found liable for the underlying Labor Code violations.

### d. Range of Exposure and Reasonable Discount

In light of the defenses and challenges discussed above, in considering the best interests of the class, Plaintiff had to discount his exposure analysis. The total exposure for Plaintiff's core claims were evaluated at approximately $37,000,000. In discounting his exposure analysis, Plaintiff had to consider the realistic potential of (1) proving XPO LM was his lawful employer under *Dynamex* and/or *Borello*; (2) achieving and maintaining class certification; and (3) recovering under each of his theories. Based on the above strengths and challenges and after considerable litigation and expansive settlement negotiations, Plaintiff and his experienced counsel concluded that the substantial sum of $5,500,000 XPO LM will pay

---

[15] *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal. App. 4th 1112, 1136 (The Court found it would be unjust to award the maximum penalty amount when "defendants took their obligations under Wage Order No. 9 seriously and attempted to comply with the law"); *Fleming v. Covidien, Inc.* (C.D. Cal. Aug. 12, 2011) 2011 WL 7563047, at *4 ("Defendants were not aware that the wage statements violated the law and took prompt steps to correct all violations once notified.").

under the terms of the proposed settlement was in the best interests of the class of drivers and helpers. Mara Decl. ¶ 51.

Courts in the Ninth Circuit have observed that "a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery." *Telecomm. Corp. v. DirectTV*, 221 F.R.D. 523, 527 (C.D. Cal. 2004). The settlement here of $5,500,000 is fair, adequate, and reasonable when considering that it provides class members with a definite and substantial recovery in proportion to the strengths and challenges associated with establishing XPO LM as the class members' employer, achieving and maintaining certification on all claims, and establishing liability for all claims.

## VI. NATURE AND METHOD OF NOTICE

### a. Data to Administrator and Notice Mailing

The Class Database is due to CPT within 14 days of the Court granting preliminary approval of the proposed Settlement. *See* Mara Decl., **Exhibit 1**, Section III, paragraph I(1)(3)(a). After performing a search based on the National Change of Address Database to update and correct any known or identifiable address changes and performing any necessary skip traces, CPT will mail the Notice to Class Members via first-class regular U.S. Mail within 21 days after the Court grants preliminary approval. *See* Mara Decl., **Exhibit 1** Section III, paragraph I(1)(3)(c). As part of the settlement administration process, CPT will maintain a website that has links to the notice, settlement agreement, motions for approval and for attorneys' fees, and the Court's orders. Settlement Class Members will have sixty (60) days from the mailing date of the notice packet to opt-out or object to the Settlement. *See* Mara Decl., **Exhibit 1** at Section I, paragraph KK.

### b. Taxpayer Identification Numbers, and Reminder Efforts

The records available to XPO LM do not contain all the taxpayer identification numbers for all Settlement Class Members. These numbers are required in order to process settlement payments and prepare tax documents. As part of the notice packet to those Settlement Class Members for whom the Administrator does not have taxpayer identification numbers, the Administrator will include an information sheet requesting the necessary information (i.e. a Social Security Number). *See* Mara Decl., **Exhibit A ("IRS W-9 Form")** of **Exhibit 1**. The Settlement Class Member will have until the Effective

Final Settlement Date[16] to submit their taxpayer identification number. The class notice that is sent to these Settlement Class Members will have a short paragraph included that describes why they need to submit their taxpayer identification numbers to receive their settlement payments. This paragraph is omitted in the class notice that will be sent to the Settlement Class Members for whom the Administrator already has a taxpayer identification number. *See* Mara Decl., **Exhibit A (Class Notice – TIN Needed)** and **(Class Notice)** for both versions of the proposed class notice.

**First Postcard:** Sixty (60) days after the Notice Packet is mailed, the Administrator will send a reminder postcard requesting taxpayer identification numbers to those Participating Settlement Class Members for whom the Administrator has not received a taxpayer identification number. *See* Mara Decl., **Exhibit 1** at Section III, paragraph I(3)(e).

**Second Postcard:** Ninety (90) days after the Notice Packet is mailed, the Administrator will send another reminder postcard to those Participating Settlement Class Members for whom the Administrator has not received a taxpayer identification number. This reminder will disclose the amount due to the Participating Settlement Class Member and request that he or she submit his or her taxpayer identification number to the Administrator. This reminder will also explain that the Participating Settlement Class Member risk forfeiture of their settlement payment to the Cy Pres beneficiary if he or she does not submit his or her taxpayer identification number by the Effective Final Settlement Date. *See* Mara Decl., **Exhibit 1** at Section III, paragraph I(3)(e).

**Final Postcard**: Within 14 days following the entry of Final Approval, the Administrator will issue a final request postcard to those Participating Settlement Class Members who have not submitted their taxpayer identification numbers. This final request will state the amount due to the Participating Settlement Class Member and explain that, if he/she does not submit his/her taxpayer identification number, his/her settlement payment will be forfeited to the Cy Pres beneficiary. *See* Mara Decl., **Exhibit 1** at Section III, paragraph I(11).

In addition to mailing these reminder postcards, the Administrator will also call or email Participating Settlement Class Members for whom it does not have taxpayer identification numbers. *See*

---

[16] Effective Final Settlement Date will be when (1) if no appeal has been filed, the deadline for appealing the Court's order finally approving the Settlement; or (2) if an appeal has been filed, the final resolution of any appeal in favor of finally approving the Settlement.

Mara Decl., **Exhibit 1** at Section III, paragraph H(1).

### c. The Notice Method Meets the Requirements of Rule 23

Rule 23 (c)(2) requires that the notice inform prospective class members of (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through counsel if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on class members under Rule 23 (c)(3) generally requires the same concepts. "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." Newberg, 2 *Newberg on Class Actions* §8.32 at 8-103.

The proposed class notices meet all of these requirements. Thus, it is respectfully requested the Court order the class notices adequately notify the class of the proposed Settlement.

## VII. CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court grant preliminary approval of the proposed Settlement, conditionally certify the class, enter the proposed Preliminary Approval Order submitted herewith, and set a Final Approval Hearing date.

Dated: August 16, 2019                                    **MARA LAW FIRM, PC**

                                                          */s/ Jamie Serb*
                                                          David Mara, Esq.
                                                          Jamie Serb, Esq.
                                                          Representing Plaintiff