David Mara, Esq. (230498)
dmara@maralawfirm.com
Jamie Serb, Esq. (289601)
jserb@maralawfirm.com
**MARA LAW FIRM, PC**
2650 Camino Del Rio North, Suite 205
San Diego, California 92108
Telephone: (619) 234-2833
Facsimile: (619) 234-4048

Matthew R. Bainer Bar No. 220972
**THE BAINER LAW FIRM**
1901 Harrison Street, Suite 1100
Oakland, CA 94612
Telephone: (510) 922-1802
Facsimile: (510) 844-7701
mbainer@bainerlawfirm.com

Attorneys for Plaintiffs HECTOR IBANEZ

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN KRAMER on behalf of himself, all others similarly situated, and on behalf of the general public, <br><br> Plaintiffs, <br><br> v. <br><br> XPO LOGISTICS, INC.; and DOES 1 – 100, <br><br> Defendants. <br> ———————————————— <br> HECTOR IBANEZ on behalf of himself, all others similarly situated, and on behalf of the general public <br><br> Plaintiffs, <br><br> v. <br><br> XPO LAST MILE, INC.; and DOES 1 – 100, <br><br> Defendants. | Case No. 3:16-cv-07039-WHO <br> *Consolidated with* 3:17-cv-04009-JSC <br><br> [*Assigned to the Honorable William H. Orrick*] <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** <br><br> **Date: April 1, 2020** <br> **Time: 2:00 p.m.** <br> **Ctrm.: 2** <br><br> Action Filed: September 22, 2016 <br> Date Removed: December 8, 2016 <br> Trial Date: December 3, 2018 <br><br> This Document Relates To: <br> *Kramer*, 3:16-cv-07039-WHO <br> *Ibanez*, 3:17-cv-04009-JSC |

**TO: ALL PARTIES HEREIN AND TO THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff, Hector Ibanez, moves this Court for an order: (1) confirming certification of the Settlement Class for settlement purposes only; (2) confirming Plaintiff Hector Ibanez as the Class Representative for the Settlement Class and granting his requested enhancement payment; (3) confirming David Mara and Jamie Serb of Mara Law Firm, PC and Matthew Bainer of the Bainer Law Firm as Class Counsel for the Settlement Class and granting their requested attorneys' fees and litigation costs; (4) finally approving the settlement embodied in the Joint Stipulation and Settlement Agreement ("Settlement" or "Settlement Agreement"); (5) confirming CPT Group, Inc. as the Settlement Administrator and granting the requested fee for its services as Settlement Administrator; (6) finally approving the PAGA Payment; and (7) entering judgment.

This motion is set for determination on April 1, 2020, at 2:00 p.m. in Courtroom No. 2 in the above entitled courthouse located at 450 Golden Gate Avenue, San Francisco, California 94102. This motion is based upon this notice, the accompanying Memorandum of Points & Authorities filed herewith, the accompanying Declaration of David Mara filed herewith, the Joint Stipulation and Settlement Agreement and all exhibits thereto, the Order Granting Preliminary Approval, the filings on record in this case, and upon such further evidence, both documentary and oral, that may be presented at the hearing of this motion.

Dated: February 26, 2020　　　　　　　**MARA LAW FIRM, PC**

By:/s/ *Jamie Serb*　　　　　　　　
　　DAVID MARA
　　JAMIE SERB
　　Attorneys for Plaintiff

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ........................................... 1

    a.    Investigation .......................................................................................... 2

    b.    Settlement Negotiations ........................................................................ 3

III.  SUMMARY OF SETTLEMENT ...................................................................... 3

    a.    The Proposed Settlement Class ............................................................ 3

    b.    Settlement Terms .................................................................................. 4

        i.    Participating Settlement Class Members' Individual Shares .............. 4

        ii.   Funding and Disbursal of Settlement Funds ...................................... 5

        iii.  Uncashed Checks ............................................................................... 5

    c.    Released Claims .................................................................................... 6

IV.   THE SETTLEMENT NOTICE PROCESS WAS SUCCESSFUL ...................... 6

    a.    Dissemination of the Class Notice ........................................................ 7

    b.    No Objections and Only Three Requests for Exclusion ......................... 7

    c.    IRS W-9 Forms ..................................................................................... 8

V.    DISCUSSION .................................................................................................. 8

    a.    The Settlement Meets the Standards Governing Final Approval ............ 8

        i.    The Settlement was a Result of Arm's-Length Negotiations ............... 9

        ii.   *In re Bluetooth* Factors are not Present Here .................................. 10

        iii.  The Settlement is Fair ...................................................................... 10

            1.   Employer Status ......................................................................... 11

            2.   Challenges to Certification .......................................................... 12

            3.   Liability on the Merits ................................................................ 12

    b.    Sufficient Discovery and Investigation Has Occurred .......................... 15

    c.    Class Counsel Have Extensive Experience Acting as Class Counsel ..... 15

    d.    The Class Members' Response to the Settlement is Further Evidence That the Settlement is Fair and Reasonable .................................................................................................. 16

    e.    The Court Should Approve the Settlement Administration Fee .............. 16

f. **The Court Should Approve the PAGA Payment to the LWDA** ..............................................17

**VI.** **CONCLUSION** .......................................................................................... **17**

# TABLE OF AUTHORITIES

**CASES**

*Alvarado v. Dart Container Corp. of California*

  4 Cal.5th 542, 565 (2018) ................................................................................................ 13

*Amaral v. Cintas Corp. No. 2*

   163 Cal.App.4th 1157, 1201 (2008) ................................................................................ 14

*Boyd v. Bechtel Corp.*,

  485 F. Supp. 610, 622 (N.D. Cal. 1979) ........................................................................... 9

*Class Plaintiffs v. Seattle*,

  955 F.2d 1268, 1276 (9th Cir. 1992) ................................................................................. 8

*Dynamex Operations West, Inc. v. Superior Court*

   4 Cal.5th 903 (2018) ...................................................................................................... 11

*Fleming v. Covidien, Inc.*

   (C.D. Cal. Aug. 12, 2011) 2011 WL 7563047, at *4 ....................................................... 14

*H&R Block Stores, Inc. v. Visa U.S.A., Inc.*,

  396 F.3d 96, 116 (2d Cir. 2005) ....................................................................................... 9

*Hanlon v. Chrysler Corp.*,

  150 F.3d 1011, 1026 (9th Cir. 1998) ........................................................................ 8, 9, 11

*In re Bluetooth Headset Products Liability Litigation*,

  654 F.3d 935, 946 (9th Cir. 2011) .................................................................................. 10

*In re Heritage Bond Litigation*,

  2005 U.S. Dist. LEXIS 13555, *9 (C.D. Cal. June 10, 2005) ........................................... 8

*Joel A. v. Giuliani*,

  218 F.3d 132, 138 (2d Cir. 2000) ..................................................................................... 8

*Kirkorian v. Borelli*,

  695 F. Supp. 446, 451 (N.D. Cal. 1988) ........................................................................... 9

*Linney v. Cellular Alaska P'ship*,

  151 F.3d 1234, 1242 (9th Cir. 1998) .............................................................................. 11

*Mandujano v. Basic Vegetable Products, Inc.*,

   541 F. 2d 832, 837 (9th Cir. 1976) ................................................................. 16

*Marshall v. Holiday Magic, Inc.*,

   550 F.2d 1173 (9th Cir. 1977) ...................................................................... 10

*Officers for Justice v. Civil Service Comm. of City and County of San Francisco*,

   688 F. 2d 615, 625 (9th Cir. 1982) ........................................................... 10, 11

*Rodriguez v. West Publishing Corp.*,

   563 F.3d 948 (9th Cir. 2009) ......................................................................... 9

*S. G. Borello & Sons, Inc. v. Department of Industrial Relations*

   48 Cal.3d 341 (1989) .................................................................................... 11

*Thurman v. Bayshore Transit Management, Inc.*

   203 Cal. App. 4th 1112, 1136 (2012) ......................................................... 14

*Van Ba Ma v. Covidien Holding, Inc.*,

   2014 U.S. Dist. LEXIS 76359, *6-7 (C.D. Cal. 2014) ................................. 10

**STATUTES**

49 U.S.C. § 31141 ........................................................................................... 13

California Code of Regulation Title 8 § 13520 .............................................. 14

California Labor Code § 203(a) ...................................................................... 14

California Labor Code § 515 (e) ..................................................................... 13

Federal Rule of Civil Procedure, Rule 23 ....................................................... 8

## I. INTRODUCTION

Named Plaintiff HECTOR IBANEZ ("Plaintiff" or "Mr. Ibanez"), a former driver for a contract carrier that contracted services to Defendant XPO Last Mile, Inc. ("XPO LM" or "Defendant") (collectively referred to as the "Parties"), alleges XPO LM was his lawful employer and that XPO LM failed to provide legally compliant meal and rest breaks, failed to pay wages for all hours worked, waiting time penalties, reimbursement of business expenses, and legally compliant pay stubs.

Mr. Ibanez now seeks final approval of the Parties' Joint Stipulation and Settlement Agreement ("Agreement" or "Settlement")[1]. The proposed Settlement is a non-reversionary $5,500,000.00 Gross Settlement Amount ("GSA") on behalf of 3,236 Settlement Class Members. The Settlement Class is defined as "all individuals who did not contract with XPO LM, and (1) are "Drivers" that performed delivery services within the state of California during the Class Period for a Carrier, or (2) are "Helpers" with a California address and were/are associated with any Carrier that performed delivery services within the state of California during the Class Period."[2] The Class Period extends from September 22, 2012 to September 6, 2019. The Settlement is projected to pay each Participating Settlement Class Member an average of $1,097.18, less employee taxes for the wages portion of the settlement share. The highest estimated settlement share is $4,617.08.

In response to the Class Notice, no Settlement Class Members objected to the settlement and only three Settlement Class Members requested exclusion from the settlement. The Settlement Class Members' response supports the Court's finding that the Settlement is fair, reasonable, and adequate. For the reasons that follow, it is respectfully requested the Court grant this motion and find the Settlement to be fair, reasonable, and adequate.

## II. FACTUAL AND PROCEDURAL BACKGROUND

XPO LM is a third-party logistics company that operates as a freight forwarder for its clients, such as retailers and distributors of furniture, appliances, and large electronics. XPO LM enters into delivery service agreements with contract carriers, which provide last mile delivery services. The contract carriers XPO LM contracts with for last mile services employ additional drivers and helpers – the putative class

---

[1] A true and correct copy of the Agreement is attached to the Declaration of David Mara, Esq. as **Exhibit 1**.
[2] The Class expressly excludes those drivers and helpers who delivered goods that were tendered to them at the Macy's warehouse located at 1200 Whipple Road, Union City, CA 94587. These individuals were part of the putative class in *Ramon Garcia, et al. v. Macy's West Stores, et al.,* case number 4:16-cv-04440.

Plaintiff's Notice of Motion and Motion for Final                    -1-
Approval of Class Action Settlement                                             Case No. 3:16-cv-07039-WHO
                                                                                *Consolidated with 3-17-04009-JSC*

members involved in this matter - to fulfill these contracts. This lawsuit alleges that XPO LM is the lawful employer of these drivers and helpers and that XPO LM violated various California wage and hour laws. Mara Decl. ¶ 13.

This matter was initially filed by Kevin Kramer in the Alameda County Superior Court on September 22, 2016. XPO LM Answered the Complaint on December 7, 2016 and removed the action to the Northern District of California on December 8, 2016. On December 9, 2016, XPO LM filed a Notice of Related Cases, alerting the Parties to the *Carter*[3] and *Garcia*[4] matters. On January 10, 2017, the Parties in all three matters attended a Case Management Conference, wherein the Court ordered all counsel to define the putative classes in all three matters. This led to all parties stipulating to their respective classes and the Court entering the order thereon on February 15, 2017. On January 27, 2017, the Court also ordered the parties in all three matters to coordinate discovery efforts. Mara Decl. ¶ 14.

On May 23, 2017, Mr. Ibanez filed a class action complaint in San Bernardino County Superior Court. XPO LM removed the case on June 23, 2017 and subsequently transferred it to the Northern District Court on July 17, 2017. On July 28, 2017, the Parties stipulated to consolidating *Kramer* and *Ibanez*, which was approved by the Court on August 3, 2017. Mr. Kramer withdrew as Plaintiff and Class Representative in October 2017. On February 6, 2018, the Parties stipulated to extend the *Ibanez* Class Period to encompass the *Kramer* class period, which the Court approved on February 7, 2018. Mara Decl. ¶ 15.

On August 19, 2019, Plaintiff filed his First Amended Complaint, which clarified the class definition and added a claim for penalties under the Private Attorney General Act of 2004 ("PAGA"). Mara Decl. ¶ 16.

### a. Investigation

Plaintiffs in this matter and in *Garcia* jointly propounded special interrogatories, requests for admissions, and demands for production of documents to which XPO LM responded. Mr. Ibanez propounded another set of demands for production, to which XPO LM also responded. XPO LM produced hundreds of thousands of documents – the majority of which were produced in a raw electronic format, requiring Plaintiff to hire an e-discovery expert to incorporate the documents into Relativity for ease of

---

[3] *Ron Carter, et al. v. XPO Last Mile, Inc., et al,* case number 3:16-cv-01231-WHO.
[4] *Ramon Garcia, et al. v. Macy's West Stores, et al.,* case number 4:16-cv-04440-WHO.

access, review, and analysis. XPO LM also provided Plaintiff with electronic records related to the Settlement Class Members, requiring Plaintiff to consult with an IT professional to analyze and interpret massive amounts of raw data, and run SQL searches and queries in the database provided. Mara Decl. ¶ 17.

Plaintiff deposed three XPO LM Rule 30(b)(6) witnesses – two of whom required travel to Atlanta, Georgia. Additionally, Plaintiff attended and deposed multiple managers responsible for various markets throughout California, as well as several contract carriers (i.e. individuals who contracted directly with XPO LM and hired the drivers and helpers who are putative class members in this matter). Mara Decl. ¶ 18.

Throughout the litigation, the Parties met and conferred regarding multiple discovery disputes. Some of these disputes were resolved informally, others required filing discovery dispute briefs with the Court. (*See* Dkt Nos. 39-46; 60, 62-63). In addition, Plaintiff interviewed over one hundred putative class members regarding their experiences with XPO LM. Plaintiff also obtained an expert for data analysis in support of the then upcoming class certification briefing, which Plaintiff would have filed if the Parties had been unable to reach the Settlement the Parties now ask the Court to finally approve. Mara Decl. ¶ 19.

### b. Settlement Negotiations

The Parties attended two days of mediation in this matter, held on October 25, 2018 in San Francisco and on November 13, 2018 in Toronto, Canada. In each of these sessions, the Parties engaged in extensive, arm's-length negotiations mediated by respected wage and hour mediator, Michael Dickstein. After considerable negotiation, the Parties were unable to reach a settlement at mediation. However, the Parties continued to negotiate at arm's-length, with Mr. Dickstein's assistance in the following months. On February 11, 2019, the Parties reached an agreement in principle to settle the case, the terms of which were negotiated over the following months and finalized in the Joint Stipulation and Settlement Agreement ("Agreement") the Parties now ask the Court to finally approve. Mara Decl. ¶ 20.

### III. SUMMARY OF SETTLEMENT

### a. The Proposed Settlement Class

The Agreement proposes a Settlement Class comprised of:

All individuals who did not contract with XPO LM, and (1) are "Drivers" that performed delivery services within the state of California during the Class Period for a Carrier, or (2) are "Helpers" with a California address and were/are associated with any Carrier that

performed delivery services within the state of California during the Class Period. This Settlement Class expressly excludes those drivers and helpers who delivered goods that were tendered to them at the Macy's warehouse located at 1200 Whipple Road, Union City, CA 94587.

The Class Database contained 3,236 individuals who fell within this Settlement Class definition. Declaration of Will Henry ("Henry Dec."), ¶ 5.

### b. Settlement Terms

Under the Agreement, XPO LM shall pay $5,500,000.00 ("Gross Settlement Amount" or "GSA") to fully and finally settle this matter. This is the total amount XPO LM can be required to pay under this Agreement, with the exception of paying the Qualified Settlement Fund, the payroll taxes not payroll taxes not paid by Settlement Class Members, which will remain XPO LM's exclusive responsibility and will be paid by XPO LM separate and apart from the GSA[5]. ***No portion of the GSA will revert to XPO LM for any reason***. Subject to the Court's final approval, the following deductions will be made from the GSA: (1) $10,000 to Plaintiff/Class Representative Hector Ibanez, to compensate him for his time, effort, and risks he undertook in filing this lawsuit; (2) $1,375,000 (25% of the GSA)[6] to Class Counsel for attorneys' fees to compensate them for their work on the lawsuit, as well as any work remaining in securing Court approval of the settlement, administration of the settlement, and obtaining dismissal of the lawsuit; (3) $119,812.06 (previously estimated not to exceed $130,000) to Class Counsel for reimbursement of their litigation costs; (4) $35,500 to CPT Group, Inc. to compensate it for its work performed and to be performed in administering the settlement; and (5) $412,500 to the California Labor and Workforce Development Agency ("LWDA") for its 75% share of the $550,000 PAGA Payment.

### i. Participating Settlement Class Members' Individual Shares

After all deductions have been made from the GSA, an estimated Net Settlement Amount ("NSA") of $3,547,197.94[7] will be distributed to Participating Settlement Class Members, resulting in an average payment of $1,097.18 per Participating Settlement Class Member and an estimated high payment of $4,617.08. Henry Dec. ¶ 21. Each Individual Settlement Share will be calculated as follows:

**Individual Settlement Share Calculation.** Each Participating Settlement Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the

---

[5] The employer's share of payroll taxes allocated to wages are estimated at $170,685.36. Henry Dec. ¶ 19.
[6] Although the Agreement permits Class Counsel to request a fee up to 33 1/3% of the GSA, Class Counsel is only requesting the 25% federal benchmark for fee requests.
[7] Henry Dec. ¶ 18.

Plaintiff's Notice of Motion and Motion for Final     -4-
Approval of Class Action Settlement                           Case No. 3:16-cv-07039-WHO
                                                              *Consolidated with 3-17-04009-JSC*

number of weeks he or she was active in California based on the Class Records[8] provided by Defendants, divided by (ii) the total number of active weeks including all Participating Settlement Class Members based on the same Class Records, and then multiplied by the Net Settlement Amount. Therefore, the value of each Settlement Class Member's Individual Settlement Share ties directly to the amount of weeks that he or she was active during the Class Period.

*See* Agreement, Section III, paragraph F(1). This method of calculation provides the closest analogy to a "workweek" calculation that could be achieved by using the records available to XPO LM. By using these calculations, Participating Settlement Class Members will automatically be allocated an Individual Settlement Share tied to the amount of time each of them were active in the records available to XPO LM.

33.3% of each Individual Settlement share is intended to settle claims for unpaid wages and will be reported on an IRS Form W2s, subject to all tax withholdings customarily withheld from an employee's wages. The remainder will be allocated as interest (33.3%) and penalties (33.4%) and is intended to settle the non-wage claims for interest and penalties and will be reported on IRS Form 1099s. *See* Agreement at Section III, paragraph F(2).

### ii. Funding and Disbursal of Settlement Funds

Following Final Approval of the Settlement, XPO LM will remit payment of the GSA to CPT within 14 calendar days after the Effective Final Settlement Date.[9] As no objections have been filed, the Effective Final Settlement Date should be 30 days after the date of the Court's order finally approving the Settlement. Within 21 business days after the Effective Final Settlement Date, the Administrator will disburse all payments required under the Settlement Agreement. *See* Agreement at Section III, paragraph I(10)(a)-(c). Therefore, assuming the Court approves the Settlement on April 1, 2020, the disbursement should occur on June 2, 2020.

### iii. Uncashed Checks

Pursuant to the Agreement, any checks issued to Participating Settlement Class Members shall

---

[8] The Parties recognize that the best available information from which to estimate Settlement Class Members' workweeks is based on the date the Settlement Class Member first appeared in Defendants' records ("Qualification Date"). The Qualification Date will be treated as the Settlement Class Members' start dates. The end date, will be the later of (1) the date when the Settlement Class Member was removed from Defendants' system (i.e., deactivated), or (2) the date of Preliminary Approval ("End Date"). The calendar weeks between the Qualification Date and the End Date, will be considered the number of active workweeks for purposes of calculating the Settlement Class Members' Individual Settlement Shares. *See* Agreement, Section III, paragraph F(1)(b).

[9] The effective date of this Settlement will be when (1) if no appeal has been filed, the deadline for appealing the Court's order finally approving the Settlement; or (2) if an appeal has been filed, the final resolution of any appeal in favor of finally approving the Settlement. *See* Agreement at Section I, paragraph O.

remain valid and negotiable for 180 days from the date of issuance. The Parties agreed that any uncashed check funds will be sent to the California State Controller's Office – Unclaimed Property Fund. Participating Settlement Class Members who did not cash their checks on time will still be able to claim their settlement money from the Unclaimed Property Fund at a future date. *See* Agreement at Section III, paragraph I(14).

Within 200 calendar days of mailing checks to Participating Settlement Class Members, the Settlement Administrator will deposit with the Cy Pres Beneficiary[10] any funds that were allocated to Participating Settlement Class Members who did not submit a taxpayer identification number to the Settlement Administrator. *See* Agreement at Section III, paragraph I(14).

### c. Released Claims

In exchange for XPO LM's promise to make the payments provided for in the Agreement, as of the Effective Final Settlement Date, Participating Settlement Class Members will:

> release all known and unknown claims ***arising from or related to facts and claims alleged in the Operative Complaint***, and any claims that could have been raised therein ***based on the facts alleged in the Operative Complaint***, whether known or not, including: (1) failure to pay all straight time wages (Labor Code §§ 510, 515, 1194); (2) failure to pay overtime (Labor Code §§ 218, 218.5, 222, 223, 224, 510, 1197, 1198); (3) failure to pay minimum wages (Labor Code §§ 1194, 1197, 1197.1); (4) failure to authorize and permit rest periods (Labor Code §§ 226.7); (5) failure to provide meal periods (Labor Code §§ 226.7, 512); (6) knowing and intentional failure to comply with itemized wage statement provisions (Labor Code §§ 226, 226.2); (7) failure to pay all wages due at the time of termination of employment (Labor Code §§ 201, 201.5, 202, 203, 205.5); (8) violation of the Unfair Competition Law (Bus. & Prof. Code §17200); (9) failure to reimburse business expenses (Labor Code § 2802); (10) penalties pursuant to the Private Attorneys' General Act of 2004 (Labor Code § 2698, et seq.); and (11) Industrial Welfare Commission Wage Orders. The release is for the benefit of the Released Parties and applies only to periods of time within the Class Period when the Participating Settlement Class Members meet the criteria for participating in this Settlement.

The release covers claims that were alleged or could have been alleged in Plaintiff's complaint and the release is tied to the facts and allegations contained therein. *See* Agreement at Section I, paragraph II; Section III, paragraph J. Only Plaintiff Ibanez has agreed to a general release of all claims, including a waiver under California Civil Code section 1542. *See* Agreement at Section III, paragraph K.

### IV. THE SETTLEMENT NOTICE PROCESS WAS SUCCESSFUL

---

[10] The Parties have agreed to use United Way of California as the Cy Pres Beneficiary. *See* Agreement at Section I, paragraph O.

### a. Dissemination of the Class Notice

The Court granted preliminary approval of the Settlement on September 6, 2019. (Dkt. # 95) At that time, CPT was appointed by the Court as the Settlement Administrator. CPT has complied with this Court's orders concerning dissemination of the Class Notice by first-class regular U.S. Mail. On September 20, 2019, XPO LM send the Class Data to CPT. Henry Dec. ¶ 5. After identifying duplicate records and consolidating the data, CPT ran skip traces on 694 Settlement Class Members to find their current addresses. *Id.* ¶ 6. This skip trace could be performed on these Settlement Class Members because CPT had social security numbers for them in the Class Data. *Id.* As described in the Stipulation filed on November 11, 2019 (Dkt. #97), much of the Class Data contained duplicative addresses. As Social Security Numbers were not known for all of the Settlement Class Members, CPT could not perform additional skip-traces on these individuals. However, Class Counsel identified a process to search for Settlement Class Members' last known addresses and telephone number using the information contained in the Class Data. This search was done through a TransUnion system called "TLOxp," which is a "deep skip trace" that filters current public and proprietary records to locate individuals, such as the Settlement Class Members here. Mara Dec. ¶ 21.

On or around December 4, 2019, the TLOxp search was completed for each Settlement Class Member in the Class Data who did not have a Social Security Number. This search provided updated contact information for the Settlement Class. Mara Dec. ¶ 22. Thereafter, the Class Notice was mailed to 3,236 Settlement Class Members on December 18, 2019. Henry Dec. ¶ 7.

As of the date of this filing, 412 Notices which were returned by the U.S. Postal Service, of which 10 had a forwarding address. As a result of CPT's further skip trace efforts on all returned mail and re-mail requests from Class Counsel and Settlement Class Members, 218 Notices were re-mailed. Ultimately, a total of 297 Notices are currently deemed undeliverable. Henry Dec. ¶¶ 9-10.

### b. No Objections and Only Three Requests for Exclusion

The deadline to submit an objection to the Settlement or a request for exclusion from the Settlement was February 17, 2020. Henry Dec. ¶ 7. No objections have been filed with the Court or submitted to CPT and only three requests for exclusion from the Settlement was received by CPT. *Id* at ¶ 11, 16. Therefore, 99.9% of the Settlement Class Members are Participating Settlement Class Members.

### c. IRS W-9 Forms

Participating Settlement Class Members will automatically receive their share of the Settlement; however, Participating Settlement Class Members are still required to submit their taxpayer identification numbers ("TIN") to CPT prior to disbursement. Prior to mailing, the Class Database contained social security numbers for 694 Class Members. Henry Dec. ¶ 6.

Class Counsel and CPT are working diligently to reach out to all Settlement Class Members who have not yet submitted their TINs. Starting February 3, 2020, CPT began a phone outreach campaign, calling Settlement Class Members for whom phone numbers were provided in an attempt to retrieve social security numbers. In addition, on February 17, 2020, CPT completed a reminder postcard mailing, requesting Social Security Numbers from Settlement Class Members. Henry Dec. ¶ 8.

Additionally, as of the date of this filing, Class Counsel has employed several law clerks to perform a phone outreach campaign to call Settlement Class Members and remind them to send in their TINs to CPT. Mara Dec. ¶ 23. This process has been successful in reaching many Settlement Class Members and Class Counsel continues to obtain IRS W9 Forms. As of the date of this filing, 1,187 Settlement Class Members have TINs on file with CPT. Henry Dec. ¶ 15.

Class Counsel and CPT will continue to reach out to Settlement Class Members to obtain their TINs. Mara Dec. ¶ 24. In addition to the above efforts, on March 17 and April 17, CPT will send out additional reminder postcards in attempts to retrieve these TINs. Henry Dec. ¶ 8.

## V. DISCUSSION

### a. The Settlement Meets the Standards Governing Final Approval

Matters that have been filed as class actions require court approval before a settlement can be consummated. *See* Fed. R. Civ. Proc. ("FRCP") 23(e). FRCP 23(e) provides that any compromise of a class action must receive Court approval. The Court has broad discretion to grant approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In determining whether a settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Heritage Bond Litigation*, 2005 U.S. Dist. LEXIS 13555, *9 (C.D. Cal. June 10, 2005) (*citing Class*

*Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

Approval of a class action settlement involves a two-step process. In determining whether to grant final approval of the settlement, a court examines the terms for overall fairness and, in so doing, balances the following factors: the strength of the plaintiff's case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed; the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and, the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026.

Here, the proposed settlement was reached only after undertaking a robust factual and legal investigation into the claims and defenses in this lawsuit. These efforts culminated in the Parties reaching an agreement to settle. The settlement amount takes into consideration the risks with regard to demonstrating XPO LM is the Settlement Class Members' employer, certifying Plaintiff's claims, as well as difficulties associated with prevailing on the merits. In light of these risks, the settlement amount is well within the ballpark of reasonableness.

### i. The Settlement was a Result of Arm's-Length Negotiations

The Ninth Circuit has shown longstanding support of settlements reached through arm's length negotiation by capable opponents. In *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009), the Ninth Circuit expressly opined that courts should defer to the "private consensual decision of the [settling] parties." *Id.* at 965, citing *Hanlon*, 150 F.3d at 1027. "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *H&R Block Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); se*e also Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) (opinion of experienced counsel is entitled to considerable weight); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (recommendations of plaintiffs' counsel should be given a presumption of reasonableness).

The Parties attended two days of mediation in this matter, held on October 25, 2018 in San Francisco and on November 13, 2018 in Toronto, Canada. In each of these sessions, the Parties engaged in extensive, arm's-length negotiations mediated by respected wage and hour mediator, Michael

Dickstein. After considerable negotiation, the Parties were unable to reach a settlement at mediation. However, the Parties continued to negotiate at arm's-length, with Mr. Dickstein's assistance in the following months. On February 11, 2019, the Parties reached an agreement in principle to settle the case. After months of further negotiations, the Parties agreed to the terms included in the Agreement. Mara Decl. ¶ 25.

### ii. *In re Bluetooth* Factors are not Present Here

In *Bluetooth,* the Ninth Circuit articulated additional factors that need to be considered, especially where a settlement has been reached prior to formal class certification. *In re Bluetooth Headset Products Liability Litigation* ("*Bluetooth*"), 654 F.3d 935, 946 (9th Cir. 2011). As such, settlement agreements reached prior to class certification must withstand a higher level of scrutiny for signs of collusion or other conflicts of interest than ordinarily required under Rule 23(e). The three signs *Bluetooth* instructs trial courts to look for are:

1. When class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply rewarded;
2. When the parties negotiate a 'clear sailing' arrangement providing for the payment of attorney's fees separate and apart from class funds without objection by defendant;
3. When the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund. *Id* at 947.

This settlement passes the *Bluetooth* test. The NSA is approximately three times larger than the fees requested by Class Counsel, which is the accepted federal benchmark of 25% of the GSA. Additionally, any amount requested by Class Counsel and not awarded by the Court shall become part of the NSA and distributable to Participating Settlement Class Members. Accordingly, unlike the settlement agreement in *Bluetooth,* the instant settlement cannot be said to arouse suspicion of collusion.

### iii. The Settlement is Fair

When evaluating the settlement terms for purposes of ruling on whether to finally approve it, the Court is to review the strength of a plaintiff's case, including "the probable outcome of a trial on the merits of liability and damages as to the claims, issues, or defenses of the class and individual class members." *Van Ba Ma v. Covidien Holding, Inc.*, 2014 U.S. Dist. LEXIS 76359, *6-7 (C.D. Cal. 2014) (*citing Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977)). In ruling on final approval, the "fairness hearing is not to be turned into a trial or a rehearsal for trial on the merits." *Id.* (*quoting Officers for Justice v. Civil Serv. Comm'n of the City and Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir.

1982)).

There is no standard or benchmark for determining whether a settlement is fair. "Ultimately the district court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Officers for Justice v. Civil Service Comm. of City and County of San Francisco*, 688 F. 2d 615, 625 (9th Cir. 1982). A court should weigh the benefits that the settlement will realize for the class against the uncertainty of litigation and the possibility that the class members would obtain no relief in the absence of a settlement. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("...it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."); *see also Hanlon*, 150 F.3d at 1026 (When considering the fairness of a proposed class settlement, courts consider the strength of a plaintiff's case against the risk, expense, complexity and likely duration of further litigation.).

Mr. Ibanez contends that XPO LM's failure to provide compliant meal and rest periods and pay all wages owed are the predominant claims in the lawsuit. However, before reaching the merits of these claims, Mr. Ibanez would first have to prove that XPO LM is his and the Settlement Class Members' lawful employer and successfully certify the class. Mara Decl. ¶ 26.

### 1. Employer Status

All of the claims alleged in this matter are based on XPO LM's failure to classify Plaintiff and the putative class members as employees. Based on deposition testimony and documents produced in this matter, Plaintiff contends that XPO LM substantially controls the putative class members and would meet the factors delineated in the *Borello* test in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, as well as the "ABC test" outlined in the recent California Supreme Court decision in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903. XPO LM contends that Plaintiff and putative class members are not its employees, but the employees of its contract carrier partners, who control the putative class members' hiring, firing, schedules, and pay. While Plaintiff believes in the strength of his arguments, he also recognizes the risk that the Court may determine Plaintiff and the putative class were not employees of XPO LM. If the Court ruled in favor of XPO LM on this issue, all of Plaintiff's claims would be extinguished, as they are all dependent upon the Court agreeing that XPO LM is Plaintiff and class members' lawful employer. Mara Decl. ¶ 27.

### 2. Challenges to Certification

While Plaintiff remains confident in the strength of his claims, he recognizes the risks of continuing with further litigation. Namely, XPO LM relies on the fact that, for the unpaid wages claim, the proposed class member drivers and helpers are paid differently, depending on the arrangement with the various contract carriers. Based on this, XPO LM concludes that Plaintiff could not show on a class-wide basis that the drivers and helpers were paid less than minimum wage, because the foundational element, i.e. how and what the drivers and helpers were paid, varied. XPO LM also raises the issue of whether drivers and helpers were provided meal and rest periods was not susceptible of common proof. In this regard, XPO LM asserted that, even if it were deemed the employer, it would be a co-employer with the contract carriers, who were involved in hiring, firing, and paying the class member drivers and helpers. Thus, XPO LM concluded that the determination of whether drivers and helpers were provided meal and rest periods would depend exclusively on XPO LM's policies or lack thereof, but also on whether the various contract carriers provided meal and rest periods. Although Plaintiff is confident the common questions that would be framed for certification would avoid these problems, these variances could cast doubt on whether class treatment is appropriate and therefore had to be factored for purposes of exploring class-wide settlement. Mara Decl. ¶ 28.

### 3. Liability on the Merits

Plaintiff could only reach the arguments on the merits of his claims if he successfully proved XPO LM was his lawful employer and certified the class. Plaintiff recognizes that none of his class-wide claims would result in a guaranteed win.

The core claims here are for meal periods, rest periods, and unpaid wages. Each of these claims required the threshold showing that XPO LM was the employer of the drivers and helpers. If the Court found this foundational showing lacking, all of Plaintiff's claims would fail. In addition to this hurdle, Plaintiff's claims for meal and rest periods faced significant challenges that had to be considered in exploring class-wide settlement.

Plaintiff's meal and rest period claims are based on the fact that XPO LM does not have policies or practices of providing meal and rest periods to the class member drivers and helpers. From this failure to provide meal and rest periods, Plaintiff argued XPO LM owes Labor Code § 226.7 premiums for each

shift worked. Aside from its employment status argument, XPO LM raises significant challenges to these claims that had to be considered, including that, regardless of whether it had policies and practices for the provision of meal and rest periods, liability would turn on whether the contract carriers, who were involved in initiating the hiring process and furnishing wages to the drivers and helpers, had meal and rest period policies. Thus, XPO LM has raised concern about whether liability, despite the absence of  meal and rest period policies directly applicable to class members, is determined by whether drivers and helpers received meal and rest periods pursuant to policies and practices communicated through their respective contract carriers. Mara Decl. ¶ 29.

If the Court found this to be the gauge of whether the drivers and helpers received lawful meal and rest periods, it would have a significant impact on both certification and liability, as Plaintiff would also have to show that drivers and helpers were not provided meal and rest periods from their respective contract carriers. Although, Plaintiff asserts that the question of meal and rest period liability is not necessitated by a showing of contract carrier policies and practices, due to Plaintiff's claims of XPO LM's extensive and pervasive control over the drivers' and helpers' workday, XPO LM's arguments had to be strongly considered in exploring class-wide settlement. Mara Decl. ¶ 30.

XPO LM also raised a concern about whether Plaintiff's claims are preempted under 49 U.S.C. § 31141, Federal Motor Carrier Safety Administration (FMCSA) regulations, an issue that is currently pending before the Ninth Circuit. If XPO LM were successful on this issue, all of Plaintiff's claims for meal and rest breaks would fail entirely. Given the uncertainty of how the Ninth Circuit will rule, a significant discount had to be factored into evaluating class-wide settlement of the meal and rest break claims. Mara Decl. ¶ 31.

Plaintiff's unpaid wages claim stems from the fact that the drivers and helpers at issue here are not paid by the hour, but on a flat, or daily rate of pay. Plaintiff claims that, like a salary for non-exempt workers, the flat rate pay system does not pay for overtime hours, i.e., hours exceeding eight daily hours or forty weekly hours. See Labor Code section 515 (e); see also *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5[th] 542, 565 ("[T]he flat sum compensates the worker for only nonovertime hours worked"). Thus, Plaintiff claims that, for hours worked in excess of eight daily or forty weekly, drivers and helpers are owed minimum wage. Mara Decl. ¶ 32.

In addition to its employment status argument, Defendant took the position that a fixed, flat rate of pay, which is commonplace in the trucking industry, pays for all hours worked at the minimum wage so long as the fixed rates exceed minimum wage for all hours worked. XPO LM also raises the concern that the foundational element of what the drivers and helpers were paid in terms of a flat rate is dependent on the individualized inquiry into the various contract carrier arrangements with drivers and helpers, which negatively impacts class certification and/or maintaining class certification. Mara Decl. ¶ 33.

XPO LM also raised defenses relating to the additional claims for waiting time penalties, itemized wage statements, and PAGA. XPO LM raised the concern that, even if it was determined to be Plaintiff's employer, it would not be liable for waiting time penalties because a "good faith dispute" exists over the payment of past wages. *See* Cal. Code Regs. Tit. 8 § 13520; *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1201. Further, XPO LM raised the concern Plaintiff would have to prove it "willfully" failed to pay class members appropriate wages due upon separation of employment, which XPO LM contends was not willful, as it was not adjudged to be the employee's employer at the time of separation. *See* Cal. Lab. Code § 203(a). Likewise, XPO LM took the position, since it has to be adjudged as the employer before it could be held liable on the merits for any of Plaintiff's claims, it would not be held liable for inaccurate wage statements, as it could not have knowingly or intentionally failed to provide wage statements to individuals it did not consider employees of XPO LM. XPO LM also pointed out that any PAGA penalties awarded would almost certainly be reduced significantly, given XPO LM had to be adjudged as the class members' employer, and made a good faith attempt to comply with the law.[11] Mara Decl. ¶ 34.

Moreover, Plaintiff's PAGA claims are based on the same alleged unlawful conduct as his class claims. Therefore, PAGA penalties could only be awarded if the factfinder agreed with Plaintiff's theories of liability. Should the Court agree with any of XPO LM's defenses to its employer status, certification, or on the merits, the potential exposure for PAGA would be reduced and any associated PAGA penalties would be extinguished, as penalties can only be awarded if the Court agrees with Plaintiff's underlying allegations. The likelihood of the Court reducing any PAGA penalties awarded to Plaintiff and aggrieved

---

[11] *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal. App. 4th 1112, 1136 (The Court found it would be unjust to award the maximum penalty amount when "defendants took their obligations under Wage Order No. 9 seriously and attempted to comply with the law"); *Fleming v. Covidien, Inc.* (C.D. Cal. Aug. 12, 2011) 2011 WL 7563047, at *4 ("Defendants were not aware that the wage statements violated the law and took prompt steps to correct all violations once notified.").

Plaintiff's Notice of Motion and Motion for Final          -14-
Approval of Class Action Settlement                                                          Case No. 3:16-cv-07039-WHO
                                                                                             *Consolidated with 3-17-04009-JSC*

employees – assuming XPO LM is determined to be the employer and liability is established – is higher in this case than others, as XPO LM was not a direct employer of the aggrieved employees. Further, these penalties would be duplicative of the recovery from the underlying violations. Therefore, Plaintiff recognizes and reasonably believes the Court would significantly reduce any PAGA penalties if XPO LM was determined to be the employer and found liable for the underlying Labor Code violations.

### b. Sufficient Discovery and Investigation Has Occurred

Class Counsel conducted a thorough investigation into the facts of this lawsuit, including extensive review of documents and data, as well as interviews of many Class Members. Plaintiff deposed three XPO LM Rule 30(b)(6) witnesses – two of whom required travel to Atlanta, Georgia. Additionally, Plaintiff attended and deposed multiple managers responsible for various markets throughout California, as well as several contract carriers (i.e. individuals who contracted directly with XPO LM and hired the drivers and helpers who are putative class members in this matter). Mara Decl. ¶ 35.

XPO LM produced hundreds of thousands of documents – the majority of which were produced in a raw electronic format, requiring Plaintiff to hire an e-discovery expert to incorporate the documents into Relativity for ease of access, review, and analysis. XPO LM also provided Plaintiff with electronic records related to the Settlement Class Members, requiring Plaintiff to consult with an IT professional to access, review, and interpret considerable amounts of raw data and run SQL searches and queries in the database provided. Mara Decl. ¶ 36.

After conducting an analysis of the materials Defendants produced, Class Counsel also drew on their extensive experience in similar cases to assess the strengths and weaknesses of Plaintiff's claims. This discovery allowed the Parties to assess the merits and value of Plaintiff's claims and defenses thereto, if a settlement was not reached. Based on their review and independent investigation into the facts and claims asserted in this matter, Class Counsel believe that this settlement is fair, reasonable, and adequate and is in the best interest of the class. Mara Decl. ¶ 37.

### c. Class Counsel Have Extensive Experience Acting as Class Counsel

Class Counsel's experience in complex class action matters is extensive. Mara Decl. ¶¶ 1-10; Bainer Decl. ¶¶ 4-5[12]. Indeed, Mr. Mara from the Mara Law Firm, PC was class counsel in *Hohnbaum et*

---

[12] *See* Declaration of Matthew Bainer, Esq. filed with the Motion for Preliminary Approval of Class Action Settlement (Dkt. # 89-2).

*al. v. Brinker Restaurant Corp et al.,* which is the subject case in the landmark decision of *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004. Mara Decl. ¶ 4. Class Counsel have prosecuted numerous cases on behalf of employees for California Labor Code violations and thus are experienced and qualified to evaluate the class claims present in this case, and the defenses thereto, and to evaluate settlement versus trial on a fully informed basis. Mara Decl. ¶¶ 1-10; Bainer Decl. ¶¶ 4-5. This experience instructed Class Counsel on the risks and uncertainties of further litigation and guided their determination to endorse the proposed settlement.

### d. The Class Members' Response to the Settlement is Further Evidence That the Settlement is Fair and Reasonable

The Ninth Circuit has held that the number of class members who object to a proposed settlement is a factor to be considered in determining a settlement's fairness. *Mandujano v. Basic Vegetable Products, Inc.*, 541 F. 2d 832, 837 (9th Cir. 1976). Here, not a single Class Member has objected to the settlement and only three Class Members requested to be excluded from the settlement, resulting in a 99.9% participation rate in the settlement. The lack of objections and low number of requests for exclusion evidences the Class Members' endorsement of this non-reversionary settlement.

### e. The Court Should Approve the Settlement Administration Fee

The Parties agreed to hire CPT Group, Inc. ("CPT") as the Settlement Administrator, a choice the Court approved in conjunction with granting preliminary approval. CPT was responsible for mailing the Class Notice to Settlement Class Members, obtaining better addresses for undeliverable Class Notices, responding to Settlement Class Member inquiries, providing weekly status reports to all counsel, receiving all communications from the Class Members, performing telephone outreach efforts to obtain TINs from Settlement Class Members, and providing a declaration documenting its duties and responsibilities in administering the Class Notice of the Settlement. Mara Dec. ¶ 39. Following the grant of final approval, CPT will continue to calculate the payments to Participating Settlement Class Members, calculate the withholding taxes, and transmit to the appropriate government agencies, send the individual Settlement Shares to Participating Settlement Class Members, distribute other payments ordered by the Court, follow up with un-cashed checks, follow up with reminder postcards, and perform such other duties as described in the Agreement. Mara Decl. ¶ 39. CPT's fee of $35,500.00 for services rendered and to be rendered is fair and reasonable and should be granted.

**f.  The Court Should Approve the PAGA Payment to the LWDA**

The payment of $412,500 (75% of $550,000) to the LWDA for its share of the applicable penalties claimed under the California Labor Code's Private Attorney General Act of 2004, as amended ("PAGA"), is reasonable under the circumstances. The Parties negotiated a good faith amount to the LWDA. The sum to be paid to the LWDA was not the result of self-interest at the expense of other Settlement Class Members. The LWDA was provided notice of the Settlement concurrently with the filing of the preliminary approval motion and the instant motion. Plaintiff did not receive a response or objection to the Settlement from the LWDA. Mara Decl. ¶ 40. Thus, Plaintiffs request the Court finally approve the sum of $412,500 for payment to the LWDA.

**VI. CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that the Court find the Settlement fair, reasonable, and adequate and grant final approval of the Settlement. Plaintiff further requests the Court approve the requested attorneys' fees, litigation costs, class representative enhancement payment, settlement administration fee, and PAGA payment. Last, Plaintiff respectfully requests the Court enter final judgment in this matter.

Dated: February 26, 2020                          **MARA LAW FIRM, PC**

                                                  /s/ *Jamie Serb*_____
                                                  David Mara, Esq.
                                                  Jamie Serb, Esq.
                                                  Representing Plaintiff

Plaintiff's Notice of Motion and Motion for Final                    -17-
Approval of Class Action Settlement                                              Case No. 3:16-cv-07039-WHO
                                                                                *Consolidated with 3-17-04009-JSC*